UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:

**KIMN S. SULLIVAN a/k/a**
**KIMBERLY S. SULLIVAN,** individually and
on behalf of those similarly situated,

       **Plaintiff,**

**vs.**                                  **DEMAND FOR JURY TRIAL**

**BANK OF AMERICA, N.A.,** and
**SAFEGUARD PROPERTIES**
**MANAGEMENT, LLC,**

       **Defendants.**

_____/

## **CLASS ACTION COMPLAINT**

Plaintiff, KIMN S. SULLIVAN a/k/a KIMBERLY S. SULLIVAN (hereinafter referred to as "Sullivan" or "Plaintiff"), by and through her undersigned counsel, bring this class action lawsuit against Defendant BANK OF AMERICA, N.A. ("BOA") and SAFEGUARD PROPERTIES MANAGEMENT, LLC ("Safeguard") (collectively "Defendants"), and alleges the following:

## **NATURE OF THE ACTION**

1.     This is a putative class action brought under rule 23 of the Federal Rules of Civil Procedure to redress the unfair and deceptive practices committed by BOA in connection with its home mortgage loan servicing business.  BOA services home loans according to uniform practices designed to maximize fees assessed on borrowers' accounts when they are behind on their payments. Consistent with these practices, BOA uses an automated default servicing platform to illegally, unfairly, and fraudulently charge defaulted or at-risk-of-default borrowers for multiple

and repetitive "property inspections" that are not required by lenders, not permitted by lender guidelines, and in many cases not allowed under state and federal regulations and guidelines.

2.      In addition, this class action seeks to recover fees improperly charged by BOA to homeowners with mortgages serviced by BOA for unnecessary expenses and/or unprovided services, which are in some cases outright fraudulent and in all cases excessive, deceptive, and otherwise unfair. These fees, such as forced placed flood insurance, are added onto the mortgage payoff amount a homeowner must pay to BOA to satisfy the lien on their property and otherwise avoid foreclosure. The fees are intentionally disguised as being for necessary or otherwise reasonable expenses to deceive homeowners, in furtherance of a scheme to generate unnecessary and improper fees, and otherwise enrich BOA at the expense of homeowners.  In addition, BOA force places insurance at unconscionably high rates, well above market rates, with no added benefit to the insured.

3.      Moreover, the acts of BOA as servicer of the loans at issue affecting Plaintiff and the Class Members, result in a regular pattern of violating the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.* ("TILA"), with respect to the forced place insurance practices and information provided about variable rate loans.

4.      Plaintiff also alleges that BOA's practices are misleading, deceptive, and unfair under state laws including, without limitation, the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201-501.203.

5.      Plaintiff and the Class Members are homeowners whose homes have been in foreclosure. BOA is servicer of the mortgage loans which encumber Plaintiff's and Class Members' homes. As both a lender and a servicer, BOA regularly acts as a debt collector.

6.      All conditions precedent to the filing of this action have been waived and/or satisfied.

## PARTIES

7.      Plaintiff Sullivan is an individual citizen of the State of Florida, residing in Palm Beach County. At all times material, she has occupied the property at issue since 2012, located at 5 Marina Gardens Drive, Palm Beach Gardens, Florida 33410.

8.      Defendant, BOA is a is a national banking association with its principal place of business in North Carolina. It is a federally chartered bank headquartered in Charlotte, North Carolina. Through its network of branch locations, BOA conducts substantial business in the State of Florida and this District.

9.      Defendant, Safeguard is a mortgage field services company organized under the laws of the State of Ohio, with its principal place of busines located in Valley View, Ohio. Safeguard is the largest privately held mortgage field services company in the United States.

## JURISDICTION AND VENUE

10.      This Court has general diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and there is complete diversity between the Plaintiffs and Defendants. This Court also has jurisdiction over this matter pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §§1332(d). CAFA's requirements are satisfied in that (1) the members of the Class exceed 100; (2) the citizenship of at least one proposed Class member is different from that of the Defendant; and (3) the matter in controversy, after aggregating the claims of the proposed Class members, exceeds $5,000,000.00, exclusive of interest and costs.

11.     The Court has subject matter jurisdiction under 28 U.S.C. § 1331 based upon the federal RICO claims asserted under 18 U.S.C. § 1961, et seq, and TILA claims under 15 U.S.C.§ 1601, *et seq*. The Court also has supplemental jurisdiction over the FCCPA § 559.72, Fla. Stat. and FUDTPA Fla. Stat. §§ 501.201, *et seq*. claims under 28 U.S.C. § 1367, because these claims are so related to the federal FDCPA claims that they form part of the same case or controversy under Article III of the United States Constitution.

12.     Venue is proper in the United States District Court in and for the Southern District of Florida pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions giving rise to the Plaintiff's claims occurred in this district.

## FACTUAL ALLEGATIONS

### A. Mortgages Contain Largely Uniform Obligations and Requirements for Loan Servicers

13.     Virtually all mortgage loans originated in the United States use either the standardized Fannie Mae/Freddie Mac Security Instrument (the "Fannie/Freddie Mortgage") or the Federal Housing Authority ("FHA") Deed of Trust. This is because at origination, the originating bank/lender must use these forms to have the possibility of selling the mortgage to Fannie/Freddie, which are the largest holders of mortgages in the United States. If the standardized forms are not used, Fannie/Freddie will not purchase the loan from the originator. Plaintiff Sullivan has a Deed of Trust utilizing the standard Fannie/Freddie Mortgage documents.

14.     While the Fannie/Freddie forms are not identical for each state, they contain sections which are uniform and do not change from state to state. Importantly, the sections of Fannie/Freddie mortgages at issue in this case are the sections that are uniform on a nationwide basis.

15.    When the mortgage loan is sold in the secondary market, for example to Fannie/Freddie, or to private investors through a Mortgage-Backed Security ("MBS"), the Servicing Rights are separated from the principal and interest income stream rights, and the Servicing Rights are either retained by the originating lender or acquired by a third-party loan servicer. A Fannie Mortgage clarifies the distinction between the "Lender" and the "Loan Servicer." The "Lender" is the originating Lender who provides the funds to the Borrower in return for repayment plus interest, i.e., the owner of the note. C.f., Exhibit 1, ¶ (C).

16.    Importantly, the Fannie Mortgage draws an additional sharp distinction between the "Lender" and the "Loan Servicer." Specifically, the "Lender" funds the loan and is entitled to repayment of principal and interest. The "Loan Servicer" "collects Periodic Payments due under the Note and … Security Instrument and performs other mortgage loan servicing obligations …" *See* Exhibit 1, ¶ 20.

17.    The Loan Servicer's duties and obligations are clearly filled in and defined by the Fannie Mae or Freddie Mac written Seller/Servicer Guidelines (the "Guidelines") when the loan is either serviced by the lender itself or sold to third-party servicer entities.

18.    In this instance, the loans at issue affecting the Plaintiff and the Class Members are serviced by BOA, acting as both the Lender and the Loan Servicer; therefore, BOA is required to comply with all servicing guidelines.

**B.  Effect of a Borrower's Default on the Loan Servicer**

19.    As explained more fully below, BOA in its role as Loan Servicer, has an economic incentive to push borrowers into default, an interest that is misaligned with borrowers and BOA's role as Lender.

20.     In the ordinary course, in the event of a default by the Borrower, the GSE/Mortgage-owner (i.e., the Lender) suffers the principal loss.  However, since the loan in this instance is securitized, the Lender, BOA, has shifted its risk to the investors and in fact profits on the securitization transaction.  Furthermore, if the Loan Servicer advanced payments on taxes, insurance premiums or other default/foreclosure related costs (including, without limitation, property inspections), the Loan Servicer does not suffer a loss of those advances in the event of foreclosure. Rather, the Lender reimburses the Loan Servicer for the outstanding amount.

21.     In this instance since BOA is both the Lender and the Loan Servicer it does not reimburse itself for the advances.  However, Fannie Mae/Freddie Mac as insurer of the loan *does* reimburse BOA for all the property inspections and any other default related services, including but not limited to, fees for advances from a loan's escrow account, such as property taxes and insurance payments.

22.     The Loan Servicer's risk of loss in the event of a Borrower's default and foreclosure is limited to a loss of the right to receive future servicing fees on the loan. In the event of default and foreclosure, Loan Servicers also stand to collect additional fee income including late fees, attorney fees, foreclosure fees, etc., that exceed the value of the servicing fees paid. If the Loan Servicer manages to work with the borrower to modify or refinance the delinquent loan, the Loan Servicer typically receives a fee (i.e., from the U.S. Treasury) in connection with that outcome as well.

23.     The potential loss of base servicing fees can pale in comparison to the ancillary fee compensation received by the Loan Servicer in connection with default servicing activities. Indeed, where the compensation received in connection with default servicing activities is greater than the present value of servicing fees—as is often the case—the Loan Servicer has a greater

interest in forcing borrowers into (and ensuring they stay in) default than it has in granting a modification or restoring the account to a fully performing loan.

24.     BOA earns revenue from mortgage loan servicing in three principal ways. First, BOA receives a fixed fee for each loan which is determined by the servicing agreements between BOA and the investors or note holders.

25.     Second, BOA earns "float" income from accrued interest between when consumers pay and when those funds are remitted to Lenders, taxing authorities, insurers and other relevant parties.

26.     Third, BOA receives ancillary fee income that includes, without limitation, late charges paid by borrowers, workout and modification incentive fees, and other delinquency-related fee income including, for example, the property inspection or "home preservation" fees at issue here.

27.     Two important sources of ancillary fee income for Defendants BOA and Safeguard are property inspection fees, and for BOA specifically, late fees. As described more fully herein, each time BOA and Safeguard inspects the property and assesses a property inspection fee on a borrower, the borrower must pay an additional $17.50 (the amount BOA presently charges) to become current. If the borrower fails to become current, BOA imposes late fees on the borrower.

28.     This practice makes it more difficult for distressed borrowers to become current and leads many borrowers into foreclosure proceedings and/or to modify their loan. As explained above, this serves BOA's interests. Because Loan Servicers like BOA can generate more revenue from loan servicing activities and fees, then from principal and interest payments made by borrowers, Loan Servicers have a vested interest in generating revenue through so-called default servicing activities and corresponding ancillary fees.

29.     Some of these fees, such as late fees, are pure profit for the Loan Servicer. Other fees permit the Loan Servicer to generate additional income by delegating the task to an affiliated entity or entity that returns a profit to the Loan Servicer.

30.     Furthermore, because BOA is able to generate more loan servicing income through default servicing activities as compared to ensuring that borrowers make timely payments on the mortgage to the benefit of the owner/investor of the loan, BOA is incentivized to keep borrowers in default, which is contrary to the interests of borrowers. Indeed, according to one member of the Board of Governors of the Federal Reserve System, "a foreclosure almost always costs the investor [of the loan] money, but [it] may actually earn money for the servicer in the form of fees."[1]

31.     Given this conflict of interest with the borrowers, even though the loan servicing and default servicing tasks performed by BOA are purportedly to protect their interests as Lender, such tasks and associated charges must be critically evaluated.

32.     One template for determining the reasonableness of the tasks and charges undertaken by the Loan Servicer are the guidelines, rules and/or regulations issued by the Lender that set forth the Loan Servicer's obligations with respect to the specific tasks at issue. None of these documents suggest that it is appropriate to inspect a property more than once during a 30-day period, if at all, or after the borrower has come current.  Rather, it is BOA's unilateral and self-serving determination *en masse* that conducting these excessive property inspections is "appropriate" regardless of the borrowers' underlying circumstances or any objective criterion related to the circumstances surrounding particular loans.

---

[1] Governor Sarah Bloom Raskin, "Problems in the Mortgage Servicing Industry," Board. of Governors of the Federal Reserve System (Nov. 12, 2010), *available*:
http://www.federalreserve.gov/newsevents/speech/raskin20101112a.htm.

33.     Defendants' schemes take advantage of the current structure of the mortgage industry. While the mortgage documents and Lender guidelines permit and, in some circumstances, require the Loan Servicer to conduct certain property inspections, BOA's Scheme ignores these guidelines and imposes, without limitation: (a) unfair and excessive property inspections that are not permitted by mortgage documents; (b) more property inspections than are required; (c) more property inspections than are permitted by federal regulations and state laws; (d) more property inspections than are warranted by the circumstances of any actual loan—i.e., without any regard for whether the property is occupied or any other factor that would make inspections warranted; and (e) charges for property inspections that are inflated by amounts that Safeguard retains for its role in the scheme. BOA engages in this scheme with minimal risk because Fannie Mae/ Freddie Mac agrees to reimburse BOA for the property inspection charges in the event that the borrower does not pay them.[2] Fannie Mae also agrees to reimburse BOA for any escrow account advances made to cover taxes, insurance, and other default related and foreclosure proceedings, which is the subject of the forced place flood insurance and property tax fees claims below.[3]

**C.  Property Inspections on Defaulted Loans**

---

[2] Fannie Mae's current servicer guidelines allow for reimbursement of $15 per exterior property inspection. *See https://servicing-guide.fanniemae.com/THE-SERVICING-GUIDE/Part-F-Servicing-Guide-Procedures-Exhibits-Quick-Referen/Chapter-F-1-Servicing-Guide-Procedures/F-1-05-Expense-Reimbursement/1045188371/F-1-05-Expense-Reimbursement-03-10-2021.htm#Defined.20Expense.20Reimbursement.20Limits*

[3] According to Fannie Mae's servicing guidelines:
"Fannie Mae will reimburse the servicer for real estate taxes and property and flood insurance premiums it advances to protect Fannie Mae's interests when there are insufficient funds in the escrow account to cover payments (or for a non-escrowed mortgage loan). Such escrow advances are reimbursable even if the expenses were advanced prior to the mortgage loan becoming delinquent. However, to be eligible for reimbursement, the mortgage loan must have subsequently become delinquent."
*https://servicing-guide.fanniemae.com/THE-SERVICING-GUIDE/Part-F-Servicing-Guide-Procedures-Exhibits-Quick-Referen/Chapter-F-1-Servicing-Guide-Procedures/F-1-05-Expense-Reimbursement/1045188371/F-1-05-Expense-Reimbursement-03-10-2021.htm#Reimbursement.20for.20Escrow.20Advances*

34.     Loan Servicers perform "servicing" tasks on behalf of the Lender that holds the loan. In some instances, the Loan Servicer and Lender are one and the same, as is the case here.

35.     The tasks a Loan Servicer performs include collecting monthly payments, monitoring insurance coverages, and ensuring that taxes are paid. Loan Servicers are also responsible for taking action to protect the properties securing loans when certain triggering circumstances arise, e.g., obtaining lender-placed insurance when the Loan Servicer determines that the property is uninsured and/or securing a property that has been abandoned to avoid damage.

### a. Fannie Mae/Freddie Mac Guidelines Control Appropriate Loan Servicing Activities

36.     The tasks Loan Servicers perform, and the standards Loan Servicers are supposed to adhere to in performing these tasks are determined by owner/investor guidelines. For example, Fannie Mae and Freddie Mac each issue written servicing guides that delineate the tasks that Loan Servicers must perform, and standards applied in evaluating Loan Servicer performance. Failure to comply with these guidelines is probative of a failure on the part of the servicer to comply with state consumer protection laws. Loan Servicers are also bound by the terms of the mortgage contracts and applicable laws and regulations.

37.     The provisions of the Fannie Mae and Freddie Mac Guidelines referencing property inspections do not require or suggest that Loan Servicers order property inspections more frequently than once every 30 days.

38.     The Fannie Mae Guidelines also does not authorize or permit inspections when the Loan Servicer is in contact with the borrower and knows the property to be inhabited.

39.     Upon taking title to the Property, Sullivan contacted BOA to ascertain the amounts due and owing under the Mortgage and has at all times since diligently sought to reinstate, modify and/or payoff the Mortgage. BOA undoubtedly knew the property was occupied and not at risk of

being damaged or neglected.  Yet, Defendants continued ordering and charging for property inspections.

40.     Fannie Mae and Freddie Mac have not taken action to prevent Defendants' violations of the guidelines because they rely on Loan Servicers to police themselves. As explained by the Federal Housing Finance Agency ("FHFA"), the conservator of Fannie Mae and Freddie Mac:

> [Fannie Mae and Freddie Mac] use a delegated business model to buy and service mortgage loans. In this model, they contract with third-party mortgage loan sellers and/or servicers (e.g., counterparties, such as banks) that are relied on to comply with their requirements for ... servicing the ... loans [purchased or guaranteed by Fannie Mae or Freddie Mac] (e.g., collecting payments); and [] reporting data about the loans. As a result of relying on the counterparties for compliance and reporting, [Fannie Mae and Freddie Mac] run the risk of their counterparties failing to meet their respective ... servicing guidelines.[4]

41.     The Office of Inspector General for the FHFA then wrote:

> In the mid-1990s, one of the Enterprises required an independent, third-party assurance of counterparties' compliance with some elements of its guidelines, but this requirement was *replaced by reliance on counterparties' self-representations of their compliance*. Further, the Enterprises have risk-based, internal oversight of their counterparties' compliance with selling and servicing guidelines *but most receive no onsite review*.[5]

42.     The OIG of the FHFA has also previously found that Fannie Mae and Freddie Mac "do not ensure counterparties' business practices follow all federal and state laws and regulations designed to protect consumers from unlawful activities."[6] "In addition, OIG identified that [Fannie Mae and Freddie Mac] do not have a formal monitoring program in place to review their counterparties' compliance with the federal and state laws that govern servicing mortgage loans.

---

[4] Letter from Russell A. Rau, Deputy Inspector General for Audits of the FHFA, to Nina Nichols, Deputy Director for Enterprise Regulation, Audit of FHFA's Oversight of Risks Associated with the Enterprises Relying on Counterparties to Comply with Selling and Servicing Guidelines (Sept. 26, 2014) ("Counterparty Risk Letter"), at 1, *available* at https://www.fhfaoig.gov/Content/Files/AUD-2014-018.pdf (last visited April 19, 2021).
[5] Counterparty Risk Letter (emphasis added), at 1.
[6] Counterparty Risk Letter, at 11.

Instead, [Fannie Mae and Freddie Mac] rely primarily on counterparty self-certifications of contractual compliance along with federal regulators' supervisory and enforcement activities."[7]

43.    Additionally, the OIG of the FHFA determined that the Loan Servicers and the inspectors utilized by them routinely charged borrowers for inspections that never took place due to the properties being in a gated community, such as Plaintiff's property, and that these "inspections" provided no useful information:

> OIG found that inspectors conducted unnecessary inspections that did not report useful information to the servicer. In one case, the inspector conducted inspections of a property in a gated community—closed to the public. For 12 consecutive months, the inspector did not obtain access to the restricted property and billed the servicer for 12 property inspections conducted from outside the gated community. None of these inspection reports contained useful information—e.g., occupancy and security status, condition, and description—which prevented the servicer from properly monitoring the status of the delinquent property for an entire year.[8]

7.    From May 17, 2010 through March 6, 2019, a period of 9 years, BOA and Safeguard ordered 100 drive-by property inspections of Sullivan's home.  In 57 of these inspections the reports submitted reflect that the inspector could not gain access and complete the inspection because the property was located in a gated community and the inspector was denied access by the guard.  However, at each instance the loan encumbering Sullivan's property was charged for the "inspection."[9]

---

[7] *Id. See* also FHFA OIG, *FHFA Should Develop and Implement a Risk-Based Plan to Monitor Oversight of Their Counterparties Compliance with Contractual Requirements Including Consumer Protection Laws* (Mar. 26, 2013), available at http://www. Fhaoig.gov/Content/Files/Aud-2013-008; Letter from Steve A. Linick, Inspector General of FHA to Edward J. DeMarco, Director, Systemic Implication Report: Oversight of Property Preservation Inspections (Nov. 26, 2012), *available* at
https://www.fhfaoig.gov/sites/default/files/SIR%20FINAL%20Enterprise%20Oversight%20of%20Property%20Preservation_0.pdf (uncovering fraud by property inspection vendor and questioning whether Fannie Mae and Freddie Mac had sufficient protections in place to detect fraud).
[8] *See* FHFA OIG, *FHFA Oversight of Enterprise Controls Over Pre-Foreclosure Property Inspections* (Mar. 25, 2014), *available* at https://www.fhfaoig.gov/Content/Files/AUD-2014-012.pdf
[9] Sullivan has only been able to obtain records reflecting property inspections conducted through March 6, 2019. However, Sullivan continues to receive monthly loan statements reflecting a "Property Inspection" charge of $17.50 to the time of the filing of this complaint.

**b.  Mortgage Contracts Establish the Legal Limits of a Loan Servicer's Powers**

44.     Mortgage loan contracts establish the parameters of the relationship between and among a borrower, the Lender, and Loan Servicer. The mortgage contracts have provisions that govern when a Loan Servicer can order property inspections and charge a borrower for the cost of such inspections.

45.     According to Paragraph 7 of the standard Fannie/Freddie Mortgage, the Lender or its agent "may make reasonable entries upon and inspections of the Property." *See, e.g.*, Exhibit 1, at ¶ 7. The Fannie/Freddie Mortgage further provides that if the "Borrower fails to perform the covenants and agreements contained in [the mortgage agreement] ... or Borrower has abandoned the Property, then Lender may do and pay for whatever is *reasonable or appropriate* to protect Lender's interest in the Property and rights under [the mortgage agreement] including protecting and/or assessing the value of the Property" *See, e.g*., *Id*. ¶ 9 (emphasis added). The form mortgage provides that any amount disbursed by the Lender for taking action under paragraph 9 becomes additional debt of the borrower.

46.     Loan Servicers of loans owned or guaranteed by Fannie Mae or Freddie Mac must follow the standards and procedures of the Fannie Mae and Freddie Mac Servicing Guidelines. Thus, these Guidelines clarify what is "reasonable or appropriate" under Paragraphs 7 and 9 of the Fannie Mortgage.

47.     However, federal regulations, discussed below, make clear that borrowers cannot be charged for property inspections unless the Lender – or Loan Servicer – has reason to believe the property is vacant.

**c.  Laws and Regulations Govern Loan Servicing**

48.     Certain federal regulations and state laws govern whether Loan Servicers, including BOA, may order a property inspection and charge the inspection to a borrower.

49.     For example, the United States Department of Housing and Urban Development imposes a limitation on Loan Servicers' ability to order property inspections and charge them to borrowers. Specifically, 24 C.F.R. § 203.377, which provides, in pertinent part:

> The mortgagee, upon learning that a property subject to a mortgage insured under this part is vacant or abandoned, shall be responsible for the inspection of such property at least monthly, if the loan thereon is in default. When a mortgage is in default and a payment thereon is not received within 45 days of the due date, and efforts to reach the mortgagor by telephone within that period have been unsuccessful, the mortgagee shall be responsible for a visual inspection of the security property to determine whether the property is vacant. The mortgagee shall take reasonable action to protect and preserve such security property when it is determined or should have been determined to be vacant or abandoned until its conveyance to the Secretary, if such action does not constitute an illegal trespass. "Reasonable action" includes the commencement of foreclosure within the time required by § 203.355(b) of this part.

50.     A bankruptcy court in the Eastern District of Pennsylvania ruled that Section 203.377 of the federal regulations trumps any provision to the contrary in FHA Mortgages.  *See In re Ruiz*, 501 B.R. 76 (Bkrtcy. E.D. Pa. 2013). In *Ruiz*, the court ruled that notwithstanding the Loan Servicer's argument that the mortgage permitted inspections solely on the basis of default, the federal regulation controlled.

### D.  The Property Inspection Fee RICO Scheme

51.     This action arises from an unlawful enterprise orchestrated by BOA and Safeguard, including their directors, employees, and agents, and their affiliated subcontracted third-party field inspector vendors ("BOA Property Inspection Enterprise").

52.     The BOA Property Inspection Enterprise illegally profits from a fraudulent scheme to increase revenue for the members of the enterprise and the other entities and individuals associated-in-fact with the unlawful enterprise by conducting unfair and excessive property

inspections whether they are needed or not, and collecting unearned and marked-up fees in the process (the "Inspection Fee RICO Scheme")

53.     BOA is one of the largest loan servicers in the United States for home loans, servicing an estimated 13,500,000 home mortgage loans.[10]  As part of is mortgage servicing practices, BOA utilizes an automated and computerized loan servicing platform that is programed to automatically and systematically take specific steps in response to various triggers that may occur in the loan servicing process. BOA began to conduct the Inspection Fee RICO Scheme by using this automated loan servicing platform that automatically triggers orders for property inspections whether or not they are needed or permitted under the terms of the BOA's agreements.

54.     Safeguard facilitates the profitability and functioning of the Inspection RICO Scheme by accepting BOA's automated property inspection orders, and upon information and belief, automatically adding a mark-up to the price of the inspections and, in turn, automatically issuing their own inspection orders that are sent to subcontracted third-party inspection vendors and/or property inspectors.

55.     Those subcontracted property inspection vendors and/or property inspectors further implement and execute Defendants' scheme by accepting Safeguard's excessive and marked-up property inspection orders and charging for the inspection, whether or not the inspection actually occurred.

56.     This self-sustaining scheme is fraudulent at every stage, but each member of the BOA Property Inspection Enterprise also concealed the fraudulent activities of their co-conspirators. In furtherance of the scheme, the members of the BOA Property Inspection

---

[10] *See In re Bank of America, N.A.,* No. AA-EC-11-12, OCC, Consent Order dated April 13, 2011, and materials *available* at https://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47b.pdf.

Enterprise each affirmatively misrepresented or concealed the fraudulent nature of the property inspections described here, as well as the existence, amount, and purpose of the fees charged to borrowers for those property inspections. The BOA Property Inspection Enterprise consists of BOA, Safeguard, and potentially other as-yet identified or known entities.  Specifically, the members of the BOA Property Inspection Enterprise claim that they engaged in property inspections only under certain agreed-upon circumstances and only to ensure that the property has not been damaged or abandoned when, in fact, these inspections are conducted automatically, whether they are necessary for the preservation of the property and permitted by contract, or not.

57.     Moreover, the members of the BOA Property Inspection Enterprise claimed, through the issuance of monthly statements and other demands for payment, that the fees charged for property inspections ordered by the BOA Property Inspection Enterprise were fair, lawful, and reasonable when, in fact, they are the consequence of an unlawful scheme to mark-up property inspection fees solely to enrich Defendants outside the scope of their contractual agreements.

58.     The BOA Property Inspection Enterprise's Inspection Fee RICO Scheme has harmed Plaintiff and the Class because: (1) they are charged for multiple, unnecessary, unreasonable, or otherwise unlawful drive-by inspections, which are marked up by Safeguard; and (2) BOA counts on the bogus inspection charges going unpaid due to the borrower's default status, and as a result tacks on additional fees, thus causing a debt spiral, rendering it difficult, if not impossible for the defaulted borrower to become current.

59.     Due to the high volume of loans BOA services, tens of thousands of borrowers have been victims of the BOA Property Inspection Enterprise's Inspection Fee RICO Scheme.

60.     This scheme is an ongoing, continuing group or unit of persons and entities associated together for the common purpose of limiting costs and maximizing profits by

conducting unfair, illegal and excessive property inspections whether they are needed or not and collecting unearned and marked-up fees in the process.

61.     Specifically, the BOA Property Inspection Enterprise's Inspection Fee RICO Scheme works as follows:  When a borrower misses a loan payment, or a loan otherwise becomes in default, BOA's loan servicing platform automatically, and without regard to owner/investor (i.e. Fannie Mae or Freddie Mac) guidelines and/or actual need, orders property inspections that are excessive in frequency and price, or otherwise unfair. Based upon BOA's practices. the loan need not technically be in default under the terms of the mortgage agreement for the property inspections to be ordered.

62.     Through the use of its automated system, BOA orders the property inspections which in turn generate work orders to its exclusive field service affiliate Safeguard,[11] who complete purported inspections, but in reality, merely drive by the property and check for signs of residency ("drive-by inspections"), if that. In most instances, the "inspection" is illusory or fabricated, because it is impossible even to do a drive-by inspection on the property because of, *e.g.*, gated communities ("fabricated inspections").

63.     BOA pays its affiliate Safeguard, and then charges borrowers' accounts for the inspections.  However, BOA does not transparently disclose these inspections fee charges on a standard mortgage statement for every instance they are performed.  Indeed, absent a specific request by the borrower for either a loan history statement or a payoff quote, BOA does not consistently disclose these inspection charges.  Instead, the charges are lumped into a category of

---

[11] In 2012 BOA and Safeguard Properties entered into an agreement whereby Safeguard Properties would acquire the employees and vendor network of the entire field service operations of BOA to assume the responsibility inspect and maintain BOA's entire portfolio of defaulted and real estate owned properties.  *See* https://safeguardproperties.com/safeguard-acquires-bank-of-americas-field-service-operations/

"other advances" on the monthly mortgage statement, without explanation, which results in BOA reaping thousands of dollars from borrowers who are unlikely to know of and challenge the fees when fighting to save their homes.

64.     What makes Defendants' scheme more outrageous is the fact that loan insurers, such as Fannie Mae, specifically agree to reimburse loan servicers, in this case BOA, for all property inspections the servicer must perform on a delinquent mortgage.  What that plainly means is that regardless of whether the Borrower is able to crawl their way out from the additional fees BOA has heaped upon their loan balance, BOA can continue to foreclose on the loan.  The result is BOA can obtain a foreclosure judgment for the amount of the loan plus the default service fees, which include the property inspection fees, and sell the property at a foreclosure sale.  Either way BOA and Safeguard reap thousands of dollars in improper and fraudulent inspection fees completing dubious and unnecessary drive-by or fabricated inspections.

65.     As the United States Bankruptcy Court for the Eastern District of Louisiana held *In re Dorothy Chase Stewart*, No. 07-11113, 2008 WL 2676961 (Bkrtcy. E.D. La. July 9, 2008), a bank's practice of using computer software to automatically trigger property inspections once a borrower is a certain number of days in default -- and to continuously order those inspections thereafter until the default is cured -- is neither necessary nor reasonable as this practice is not designed to protect the lender's interest in the property. Rather, these automatic inspections are actually conducted to generate additional fees and thereby create more "float" income, boosting the bank's bottom line.

66.     Due to the high volume of loans BOA services, tens of thousands of borrowers have been victims of this Scheme.

67. The Inspection Scheme is successful as (1) BOA uses its Safeguard affiliates as a go-between for drive-by and fabricated inspections; (2) BOA systematically and automatically causes the inspections to be ordered, whether they are needed, permitted, or lawful, or not; and (3) loan investors/insurers (such as Fannie Mae) rely on BOA to follow their guidelines and government regulations, and cannot or do not police Defendants' activities for compliance.

68. Plaintiff and Class Members are harmed by the Inspection Scheme because (1) they are charged for multiple, unnecessary, unreasonable, or otherwise unlawful drive-by inspections, which are essentially marked up by Safeguard[12]; and (2) because BOA counts on the bogus inspection charges going unpaid due to the borrower's default status, and as a result tacks on additional late fees, thus causing a debt spiral, rendering it difficult, if not impossible for the defaulted borrower to become current.

69. Participation by Safeguard allows the Inspection Scheme to function more effectively, because it allows the normal checks and balances within the loan servicing process to be eliminated. Not surprisingly, the price BOA charged borrowers for property inspections increased at the same time that BOA and Safeguard began their exclusive relationship and BOA began sending inspection orders through Safeguard as part of this affiliation. On information and belief, at the same time Safeguard contracted to pay the third-party vendors less per inspection than they were charging. Additionally, BOA in some instances increased the frequency—up to two or more inspections in a 30-day period and sometimes multiple inspections in a single day—only after Safeguard began providing the inspection "services." Safeguard colluded with BOA to

---

[12] Safeguard utilizes third party "field inspectors" to complete a property inspection. These field inspectors are vendor inspectors, often having their own property inspection business, where Safeguard employs them as independent contractors. Safeguard often will utilize a different "inspector" for the same route, based upon the lowest price they will charge Safeguard to complete the inspection. Safeguard pockets the difference and charges BOA the full amount of the inspection, which is then passed on to the borrower and applied for reimbursement from Fannie Mae. There is absolutely no reason why BOA cannot contract with the third-party vendor inspectors directly.

drive up the fee income that BOA received by increasing both the pricing and frequency of property inspections.

70.     Defendants are linked through contractual relationships, agreements, access to computer software programs that are designed to interface with each other, financial ties, and coordination of activities between Defendants and third-party inspectors. These software servicing systems create a common communication network by which Defendants communicate and share information. The servicing systems enable Defendants to charge Plaintiff and the Class Members improper fees, to collect and record the payments of these fees, and to share the resulting profits.

71.     Defendants control and operate the Inspection Scheme as follows: (a) BOA uses an automated program in its loan servicing platform to order multiple and serial property inspections merely because a borrower is behind in payments and without regard to whether an inspection is actually warranted under the circumstances, called for under the Fannie Mae or Freddie Mac written Seller/Servicer Guidelines (the "Guidelines") which govern servicers of Fannie Mae or Freddie Mac loans, or permitted by the mortgage contracts or applicable law; (b) the inspection order is automatically sent to Safeguard for fulfilment; (c) Safeguard runs the order through its systems and delegates the actual "inspection" to a complicit third party subcontractor vendor to complete; (d) the third party vendor/inspector completes, if anything, a cursory "drive-by" inspection of the subject property and submits an inspection report (where not even a "drive-by" inspection is possible, the inspection is simply fabricated); (e) the inspection report is returned to Safeguard through its software, which provides it to BOA;  (f) Safeguard pays the third-party subcontractor vendor/inspector and submits a marked-up invoice to BOA; and (g) BOA charges Plaintiff and the Class Members the marked-up, unfair, and unnecessary property inspection fee.

72.     As a result of the Inspection Scheme, Defendants have obtained Plaintiff's and the Class' money and damaged their property, as well as increased their debt obligations without justification and contrary to applicable law.

**E.  BOA Charged Plaintiff Unfair Property Inspection Fees**

73.     On May 8, 2012, Sullivan purchased the property located at 5 Marina Gardens Drive, Palm Beach Gardens, Florida 33410 ("the Property"), in accordance with a certificate of title issued by the Palm Beach County Clerk of Courts, in connection with a lien foreclosure action filed by the governing homeowners' association against Anita Mandal ("Mandal"). Mandal had purchased the Property on February 15, 2005 and executed an Adjustable Rate Promissory Note in favor of BOA.  The Note was secured by a standard Fannie Mae/Freddie Mac Uniform Security Instrument deed of trust. Because title to the Property was purchased via a homeowners' association's foreclosure action, Sullivan acquired title to the Property subject to the previous owner's first mortgage of record (the "Mortgage").

74.     As stated above, upon taking title to the Property, Sullivan contacted BOA to ascertain the amounts due and owing under the Mortgage and has at all times since diligently sought to reinstate, modify and/or payoff the Mortgage. Despite her repeated efforts, however, BOA refused to communicate with Sullivan and instead sought to foreclose the Mortgage by filing a foreclosure action in Palm Beach County on July 18, 2012 ("the Complaint"). Notwithstanding knowing for months that Sullivan had purchased title to the property and was in fact attempting to contact BOA and attempt to resolve the mortgage debt/delinquency, BOA specifically choose to not name Sullivan as a defendant even though she was an indispensable party to BOA's foreclosure claim under well-settled Florida law.

75.     In spite of Sullivan's many repeated attempts to communicate with BOA or otherwise get BOA to acknowledge her as the owner of the Property, BOA continued to pursue foreclosure against Mandal without recognizing Sullivan as the rightful owner of the Property well into 2014. It was not until this the foreclosure court ordered BOA to amend its complaint and add, the titleholder of the property at the time of the filing of the foreclosure complaint, Sullivan, as a party to the action.

76.     Frustrated by BOA's continued lack of communication, and unsure of her rights, on April 6, 2018, Sullivan ultimately made BOA a written offer to pay $500,000.00 (based on representations made by BOA in written communications to Sullivan, including monthly statements BOA continues to send to her, this amount would have been sufficient to fully satisfy all amounts ostensibly owed under the Mortgage at the time). [13] As it did with her many repeated requests for a payoff statement, BOA ignored Sullivan's written offer and otherwise refused to engage her in good-faith settlement discussions. which permitted BOA to continue to accrue unlawful charges for fraudulent property inspections that were never performed. [14].

77.     It was not until March 2019 – almost seven years after Sullivan bought the Property and after six years of expressly refusing to acknowledge Sullivan's interest in the Property or to otherwise confer with her – that BOA finally acknowledged Sullivan as the lawful successor in interest under the Mortgage in a written communication dated March 21, 2019. Thereafter, BOA began to send her communications concerning the property, including records reflecting the

---

[13] In violation of both state and federal law, BOA has ignored Sullivan's repeated requests for a written payoff setting forth the amounts allegedly owed under the Mortgage and has otherwise refused to communicate to Sullivan the total amount Sullivan is required to pay in order to satisfy the Mortgage.

[14] BOA also charged Sullivan for taxes that were never paid, and property insurance that was not necessary and/or never procured, charges which are the subject of other claims in this action.

amount and nature of the property inspections and other charges being added to balance of the loan.

78.     After receiving a Loan History Statement on December 28, 2019, Sullivan began to have doubts concerning the amounts BOA was claiming to be owed under the Mortgage. Due to the nature of the gated community in which the Property is located, Sullivan suspected that the amounts BOA claimed to be owed for purported property inspections were false and otherwise fraudulent. As a result, Sullivan sought discovery from BOA concerning the monthly charges BOA represented as being owed for property inspections, and Sullivan simultaneously sought and obtained written records from the homeowners' association concerning the community gate.

79.     While BOA attempted to withhold the requested information from Sullivan, she ultimately prevailed in obtaining the relevant property inspection records from BOA, which confirmed Sullivan's suspicions regarding the fraudulent nature of the supposed property inspection fees. More specifically, BOA's own records establish that BOA and Safeguard fraudulently charged for property inspections that were never performed. At the same time, the gate records obtained from the association fail to reflect any visitors to the Property for the handful of inspections that supposedly actually took place according to the documents produced by BOA. Finally, despite Sullivan's explicit requests to do so, BOA has refused to provide canceled checks or other proof of payment evidencing expenses it purportedly incurred for property inspections of the Property.

80.     The records obtained from BOA reflect that from May 17, 2010 through March 6, 2019, a period of 9 years, BOA and Safeguard ordered 100 drive-by property inspections of Sullivan's home.  In 57 of these inspections the reports submitted reflect that the inspector could not gain access and complete the inspection because the property was located in a gated community

and the inspector was denied access by the guard.  However, at each instance the loan encumbering Sullivan's property was charged for the "inspection."[15]

### F.  BOA'S Forced Placed Insurance Practices

81.     Lenders and Loan Servicers, like BOA here, force place insurance coverage when a borrower fails to obtain or maintain proper hazard, flood, or wind insurance coverage on the property that secures his or her loan. Under the typical mortgage agreement, if the insurance policy lapses or provides insufficient coverage, the lender has the right to "force place" new coverage on the property to protect its interest and then charge the borrower the cost of coverage.   The Defendants' force-placed insurance scheme takes advantage of the broad discretion afforded the lenders and servicers in standard form mortgage agreements.

82.     Permitting a lender to forcibly place insurance on a mortgaged property and charge the borrower for the cost of the coverage is neither a new concept nor a term undisclosed to borrowers in mortgage agreements. The standard form mortgage agreements owned or serviced by BOA include a provision requiring the borrower to maintain hazard insurance coverage, flood insurance coverage if the property is located in a Special Flood Hazard Area ("SFHA") as determined by the Federal Emergency Management Agency ("FEMA"), and wind insurance coverage on the property securing the loan, and in the event the insurance lapses, permit the lender to obtain force-placed coverage and charge the borrower for the cost rather than declare the borrower in default.

83.     The money to finance force-placed insurance schemes comes from unsuspecting borrowers who are charged inflated amounts for force-placed insurance by lenders or servicers –

---

[15] Sullivan has only been able to obtain records reflecting property inspections conducted through March 6, 2019. However, Sullivan continues to receive monthly loan statements reflecting a "Property Inspection" charge of $17.50 to the time of the filing of this complaint.

BOA here. Borrowers are required to pay the full amount that the lender or servicer initially pay to the insurer.

84.     When borrowers are force-placed insurance by BOA, regardless of the circumstances, BOA unfairly profits due to receiving kickbacks in the form of commissions and discounted services, and/or other compensation for itself and its affiliates in connection with the policies.

85.     BOA's force-placed insurance program was operated in coordination with QBE First Insurance Agency ("QBE")[16] and its predecessor entities Balboa Insurance Group ("BIG"), Balboa Insurance Company ("BIC") and Newport Management Corporation ("NMC") (collectively "Balboa") and involved various other BOA entities including but not limited to Banc of America Insurance Services, Inc. ("BAISI") and non-BOA entities including but not limited to Southwest Business Corporation ("SWBC"), Lexington Insurance Company ("Lexington"), Illinois Union Insurance Company ("Illinois Union") and Lloyd's of London ("Lloyds").

86.     During the class period, BOA had agreements with, or owned, force-placed insurers and insurance service providers. Pursuant to these agreements and ownership structures, BOA had its loan servicing portfolio automatically tracked to ensure that each borrower whose property was in an SFHA had flood insurance that met BOA's requirements. When the tracking entity determined that such insurance was not maintained, a letter cycle commenced whereby letters were generated and sent to the borrower demanding proof of acceptable insurance. If the borrower failed to provide proof of acceptable insurance, a force-placed policy was obtained for the borrower from

---

[16] QBE First Insurance Agency, Inc. is a California corporation with its principal place of business in Atlanta, Georgia. In 2011, QBE purchased the lender placed insurance program and portfolio of Balboa Insurance Group, including the lender placed insurance program of BOA. Balboa Insurance Group and its subsidiaries, Balboa Insurance Company and Newport Management Company, operated BOA's force-placed flood insurance program until the sale to QBE. After that sale, QBE has taken over BOA's force-placed insurance program. QBE performs numerous services related to its role in tracking properties for BOA's lender-placed insurance program.

an insurer with whom BOA had an agreement and the premium was charged to the borrower. Pursuant to BOA's agreements, various entities affiliated with BOA received a percentage of the premiums charged to borrowers.

87.     BOA has the power and exerts that power to force borrowers to pay for the excessive, unnecessary and unauthorized force-placed flood insurance at exorbitant premiums because BOA can simply withdraw the amounts from borrowers' escrow accounts, add the amounts to the loan balance, and ultimately foreclose on the property should the borrower fail to pay the inflated force-placed premiums. When BOA force-places one of these excessively priced, unwarranted flood insurance policies and assesses the cost on the borrower through these methods, it can lead to the imposition of various fees in addition to the force-placed premiums, including late fees, while also creating a negative credit reporting situation for the borrower and may ultimately lead to loan modification or foreclosure, which creates for BOA the opportunity to generate even more servicer fee income.

88.     Florida has been at the epicenter of all force-placed insurance activity nationwide more than one-third of all force-placed policies are placed in Florida, three times more than in California, which has the second-highest volume.

89.     The Mortgage agreement encumbering Plaintiff's Property contained the following standard provision:

> **5. Property Insurance**. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires….
>
> If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage.

Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

90.     In addition to the provision described above, the Mortgage agreement encumbering Plaintiff's Property contained a standard addendum known as a "Planned Unit Development Rider" or "PUD Rider," which provides in pertinent part as follows:

**B. Property Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included the term "extended coverage," and any other hazards, including but not limited to, earthquakes and floods, from which Lender requires insurance, then: (i) Lender waives the provisions in Section 3 for Periodic Payment to Lender of yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

91.     All Class Members' mortgages contain the same or nearly identical language as Plaintiff's mortgage.

92.     At all times material, there was in place a flood and/or hazard insurance policy, which satisfied the PUD Rider, for the properties owned by the Plaintiff and the Class Members.

93.     Additionally, at all relevant time periods, BOA had notice and knew that Plaintiff's property was covered by a flood and/or hazard insurance policy. BOA took no action after receiving this notice; and it did not in any way challenge the adequacy of the flood and/or hazard insurance.

94.     What was unknown, to Plaintiff and the Members of the Class, and not disclosed in the mortgage agreements is that BOA has exclusive arrangements with certain insurers pursuant to which lenders, such as BOA, servicers in this instance BOA, and insurers, manipulate the force-placed insurance market and artificially inflate premiums.  The premiums are inflated to provide lenders and servicers with kickbacks disguised as "commissions" (usually paid to an affiliate) or provide the lender or servicer (through an affiliate) with lucrative reinsurance arrangements as well as to include unmerited charges. The borrower is then forced to pay the inflated premiums

**G. Forced Placed Flood Insurance Scheme**

95.     BOA has engaged in a scheme to generate additional fees and income for itself and its affiliates by requiring borrowers whose loans it services to purchase additional flood insurance in excess of the requirements under the NFIA, the mortgage agreements, HUD, and the Fannie Mae/Freddie Mac guidelines. Through this practice, BOA generated significant profits for itself and its affiliates through, inter alia, commissions, kickbacks, and in-kind payments and other fees.

96.     Although mortgage loan agreements typically permit the lender or loan servicer to force-place insurance when adequate insurance is not in place, the lender or loan servicer's discretion in setting up its force-placed insurance program to invoke the provision is limited by the bounds of reasonable conduct and by the express terms of the mortgage contract itself.

97.     In an effort to reap profits from Plaintiff and the Class, BOA has routinely exceeded the bounds of reasonableness and the spirit, intent, and letter of the mortgage loan contracts by force-placing insurance in a manner and in amounts that are not required to protect the lender's

interest in the property, and which are neither required nor contemplated by the mortgage contracts.[17]

98.     Specifically, Plaintiff's and the Class Members' mortgage loan contracts, which are standardized mortgage contracts, do not permit the lender or loan servicer to receive a financial benefit in connection with force-placed insurance policies. Instead, the contracts only allow costs that are reasonable and necessary to protect the lender's interest in the secured property to be passed on to the borrower.

99.     Force-placed insurance policies are almost always more expensive than standard insurance coverage. Reportedly, such policies cost up to ten times more than standard policies. While the FPI policy is for the benefit of the lender, the cost is passed on to the borrower. Once a lender and/or servicer receives evidence that a borrower has obtained his/her own insurance policy, the force-placed coverage should be cancelled, and premiums should be fully or partially refunded.

100.     The forced placement of insurance policies can be a very lucrative business for loan servicers. Commonly, the loan servicer selects the force-placed insurance provider in accordance with a pre-arranged agreement and force-places the policy in such a way as to receive a financial benefit from the provider. The financial benefits typically, and as is the case here, take the form of reduced cost services such as insurance tracking services and unearned commissions.

101.     Under the commission arrangement, the provider of the force-placed insurance policy pays a commission either directly to the servicer or to an affiliate posing as an insurance "agent." Typically, under such an arrangement, commissions are paid to a "licensed insurance agency" that is simply an affiliate or subsidiary of the loan servicer and exists only to collect the

---

[17] *See* Fannie Mae Servicing Guide B-6-01: Lender-Placed Insurance Requirements (10/14/15), *available* at https://servicing-guide.fanniemae.com/THE-SERVICING-GUIDE/Part-B-Escrow-Taxes-Assessments-and-Insurance/Chapter-B-6-Lender-Placed-Insurance/B-6-01-Lender-Placed-Insurance-Requirements/1041095611/B-6-01-Lender-Placed-Insurance-Requirements-10-14-2015.htm

kickbacks or commissions collected from the force-placed insurance provider. These "commissions" conferred a benefit on BOA that was not authorized by Plaintiff's mortgage agreement.

102.   Loan servicers, including BOA, also do not perform their own insurance tracking. Instead, BOA and other loan servicers contract with the insurer or the insurer's affiliate to perform the tracking services at a reduced cost. In BOA's case, prior to 2011, BOA's tracking functions were performed by BOA's own affiliate which was owned by BOA's affiliated insurance company.[18] The reduction in the cost of the services is made up by the company as part of the FPI charges to borrowers.

103.   Indeed, during his testimony before the Property and Casualty Insurance and the Market Regulation and Consumer Affairs Committees at the 2012 NAIC Summer National Meeting on August 9, 2012, Joseph Markowicz of PRP Claims – an organization that claims to have been "Bridging the Lending and Insurance Communities, since 1992" – recognized that FPI premiums include not just the risk incurred, but also "administrative costs undertaken by the LPI carrier on the lenders' behalf, that are bundled into the costs of the premium" which in turn are passed on to "the general public." *See* Joseph Markowicz, PRP Claims, NAIC Testimony (Aug. 9, 2012).[19] Thus, in return for purchasing higher-priced FPI, insurers provide kickbacks to lenders in the form of services, the cost of which is ultimately borne by the mortgagee.

104.   J. Robert Hunter, who is the Director of Insurance at the Consumer Federation of America, described these practices in his testimony before the New York Financial Services

---

[18] BOA first forced placed flood insurance on Plaintiff's home on October 9, 2009.
[19] *Available* at http://www.naic.org/documents/committees_c_120809_public_hearing_lender_placed_insurance _testimony_markowicz.pdf (last visited Apr. 21, 2021).

Department ("NYDFS") in connection with the Department's inquiry into force-placed insurance practices:

> In some instances, lenders use [force-placed] insurance as a profit center by collecting commissions from insurers through lender-affiliated agents or broker[s] or by receiving below-cost or free services (such as tracking of loans) from insurers, and/or using "fronting" primary insurers to direct the coverage to lender affiliated captive reinsurers. Lenders often receive free or below cost service from affiliated service providers.[20]

As Birny Birnbaum of the Center for Economic Justice, another experienced and noted expert in the area of force-placed insurance, testified: that "[s]ervicers have financial incentives to force place the insurance because the premiums include commissions and other considerations for the servicer."[21]  Borrowers have no say or input into the carrier or terms of the force-placed insurance policies. The terms and conditions of the insurance policy, as well as the cost of the policy, are determined by the servicer and the insurer, rather than negotiated between the borrower and the insurer.

105.    As J. Robert Hunter in his testimony before the New York Financial Services Department argued, "lack of underwriting should also result in much lower acquisition expenses for FPI insurers, since no sales force is required to place the insurance." *See* Hunter NYDFS Testimony at 5.  The lack of individual underwriting does not result in lower prices for consumers; quite the contrary, actually. Instead, as a result of the schemes described herein between the insurers and servicers, consumers are gouged.

---

[20] *See* Testimony of J. Robert Hunter, Director of Insurance, Before the NYDFS on Force-Placed Insurance in New York (May 17, 2012) at 1, *available* at
http://www.dfs.ny.gov/insurance/hearing/fp_052012/Hunter_written_testimony.pdf (last visited Apr. 21, 2021)
("Hunter NYDFS Testimony").
[21] *See* Testimony of Birny Birnbaum on behalf of the Center for Economic Justice, Public Hearing on Force-Placed Insurance before the NYDFS (May 21, 2012) at 15, *available* at
http://www.dfs.ny.gov/insurance/hearing/fp_052012/fp_trans_20120521.pdf (last visited Apr. 21, 2021) ("Birnbaum NYDFS Testimony").

106.    Fannie Mae has also changed its policies to curb bank and servicers' improper practices.  First, on March 6, 2012, Fannie Mae issued a Request for Proposal ("RFP") relating to lender placed insurance. In its RFP, Fannie Mae stated that it had conducted an "extensive internal review" of the lender-placed insurance process and found that the process "can be improved through unit price reductions and fee transparency to the benefit of both the taxpayers and homeowners." In particular, Fannie Mae made the following observations:

(a) "Lender Placed Insurers often pay commissions/fees to Servicers for placing business with them. The cost of such commissions/fees is recovered in part or in whole by the Lender Placed Insurer from the premiums[.]"

(b) "The existing system may encourage Servicers to purchase Lender Placed Insurance from Providers that pay high commissions/fees to the Servicers and provide tracking, rather than those that offer the best pricing and terms. . . . Thus, the Lender Placed Insurers and Servicers have little incentive to hold premium costs down."

(c) "[M]uch of the current lender placed insurance cost borne by Fannie Mae results from an incentive arrangement between Lender Placed Insurers and Servicers that disadvantages Fannie Mae and the homeowner."

*See* Fannie Mae Request For Proposal dated March 6, 2012.

107.    Fannie Mae stated that it sought to "[r]estructure the business model to align Servicer incentives with the best interest of Fannie Mae and homeowners." Among other things, Fannie Mae sought to "[e]liminate the ability of Servicers to pass on the cost of commissions/fees to Fannie Mae" and to "[s]eparate the commissions and fees for Insurance Tracking Services from the fees for Lender Placed Insurance to ensure transparency and accountability." *Id*. at 3.

108.    On March 14, 2012, Fannie Mae issued a Service Guide Announcement "amending and clarifying its policies regarding the use, coverage, requirements, deductibles, carrier eligibility requirements and allowable expenses for lender-placed insurance" for servicers of the loans it holds. *See* Fannie Mae Servicing Guide Announcement SVC-2012-04.  The Fannie Mae guidelines

seek to eliminate the abuses prevalent in the force-placed insurance industry (such as those engaged in by BOA) including requiring that the cost of force-placed insurance be "competitively priced" and "commercially reasonable" and must exclude:

- any lender-placed insurance commission earned on that policy by the servicer or any related entity;

- costs associated with insurance tracking or administration, or;

- any other costs beyond the actual cost of the lender-placed insurance policy premium.

*Id*. at 4.

109.    On March 26, 2013, the Federal Housing Finance Agency ("FHFA") issued a Notice regarding Lender Placed Insurance. This Notice "sets forth an approach to address certain practices relating to lender placed insurance that the [FHFA] considers contrary to prudent business practices [and] to appropriate administration of Fannie Mae and Freddie Mac (the Enterprises) guaranteed loans," and which result in "litigation and reputational risks." *See* Federal Housing Finance Agency, No. 2013-05 Lender Placed Insurance, Terms and Conditions.

110.    The FHFA prohibits:

<u>Certain Sales Commissions</u>. The Enterprises shall prohibit sellers and servicers from receiving, directly or indirectly, remuneration associated with placing coverage with or maintaining placement with particular insurance providers.

111.    The FHFA acknowledged:

(d)  "Reportedly, premiums for lender placed insurance are generally double those for voluntary insurance and, in certain instances, significantly higher." *Id*. at 2.

(e)   "[T]he multiples involved may not reflect claims experience..." *Id*.

(f)  "Loss ratios for lender placed insurance are significantly below those for voluntary hazard insurance and some states have required or have considered rate reductions of 30 percent or more." *Id*.

(g) "Concerns about lender placed insurance costs, compensation and practices have been raised by the National Association of Insurance Commissioners, state regulators, the Consumer Financial Protection Bureau, state attorneys general and consumer organizations. Generally, the focus has centered on excessive rates and costs passed on to borrowers, as well as commissions and other compensation paid to servicers by carriers. In order to keep lender placed insurance costs to the Enterprises as low as possible, practices that provide incentives for and do not deter higher costs should be avoided." *Id*. at 3

112.    BOA, in particular, made its decision to force-place flood insurance together with its affiliate Balboa and other insurance affiliates until Balboa sold its force-placed insurance business to QBE in 2011. BOA's arrangement with QBE stemmed from that sale and is governed by contracts executed contemporaneously therewith.

113.    Both before and after Balboa's sale of its force-placed insurance business, BOA unfairly profited from the forced placement of flood insurance on Plaintiff and the Class Members. BOA's affiliates charge excessively high insurance premiums above what an independent insurance company would charge, even though those insurance policies are, as described in BOA's letters to Plaintiff, limited compared with independently written insurance policies.

114.    BOA paid a reduced-cost fee to its affiliate Newport Management Corporation ("NMC") to monitor BOA's loan servicing portfolio for insurance that met BOA's requirement. When a lack of such insurance was detected, BOA commenced a letter cycle that demanded evidence of acceptable insurance. If the borrower failed to provide evidence of insurance that met BOA's requirements, the cycle culminated in a force-placed insurance policy being issued and charged to the borrower.

115.    This process was highly automated. NMC would issue an order for force-placed insurance policies in a nightly batch. NMC would order the policies through a surplus lines broker which would, in turn, obtain the policy from a carrier. The surplus lines broker was also an affiliate

of BOA until Balboa sold its force-placed business to QBE. Both NMC and the surplus lines broker took commissions on the force-placed policies. At times, an additional commission was paid to BOA's affiliated insurance agency, Banc of America Insurance Services, Inc. ("BAISI").

116.    When Balboa sold off the force-placed insurance business to QBE, BOA entered into exclusive agreements with QBE to run BOA's force-placed insurance program. Pursuant to the agreements, BOA continued to receive reduced-cost insurance tracking services. The agreements also provided for BOA to continue to receive a share of profits attributable to the force-placed insurance business sold to QBE.

117.    BOA has engaged in the above practices in order to realize unfair financial gains from Class Members, including Plaintiff. By adding the cost of force-placed insurance to borrowers' loan balances, BOA earns additional interest on the amounts charged, and causes borrowers to incur additional costs and fees. By purchasing force-placed insurance from its subsidiary Balboa and other insurance affiliates, BOA also earned commissions for Balboa and its other insurance affiliates, and ultimately realized the entire profit on the transaction.

118.    Ultimately it is the unsuspecting borrower who suffers the consequences of these unconscionable practices. Furthermore, when the cost of the high-priced premium is added by the BOA to a homeowner's mortgage balance, it thereby increases the interest paid over the life of the loan by the homeowner to the lender.

**H.  BOA Has Forced-Placed Plaintiff Into Unnecessary and Inflated Flood Insurance**

119.    The actions and practices described above are unconscionable and done in bad faith with the sole objective to maximize profits. Plaintiff here does not challenge BOA's right to force place insurance in the first instance. Plaintiff challenges BOA's manipulation of the force-placed insurance market with an eye toward artificially inflating premiums and placing unnecessary

coverage, which BOA purchases from its selected insurer and then chooses to pass on to the borrower.

120.    As stated above, the Mortgage encumbering Sullivan's property and the Class Members' properties all contain standard property insurance requirements pursuant to Fannie Mae/Freddie Mac guidelines.  Moreover, each mortgage contains a uniform PUD Rider that provides a waiver of the property insurance/flood insurance requirement if said insurance was provided by a homeowners' association associated with the property.  At all times, Sullivan's property was covered by either a flood insurance policy provided by the homeowners' association or Sullivan personally took out and paid for an acceptable flood insurance policy.   Sullivan even added BOA to the master policy as an insured and sent BOA proof of that coverage.

121.    BOA charged to Plaintiff and the Class Members, who are owners of residential properties subject to a PUD, flood and/or hazard insurance premiums that were not required by the mortgage instrument, homeowners' association documents, or applicable law. The standardized mortgage agreements are essentially identical and applicable to Plaintiff and all Class Members, that BOA services, permits them to unilaterally charge, and collect, funds from property owners subject to these mortgages, such as flood and/or hazard insurance.  However, BOA may do so only where the homeowners' association has not already purchased flood or hazard insurance that covers the member properties.

122.    Here BOA, charged premiums for flood or hazard insurance even where it knew that the subject property was already covered by a master or blanket insurance policy, paid for by the homeowners' association or the homeowner directly, making the additional flood and/or hazard insurance charged both excessive and contrary to law.

123.    The Property had been insured under a homeowners' association flood insurance policy and a master hazard insurance policy since its construction in 2000.

124.    Additionally, since taking title to the Property by Sullivan in 2012, the Property has been fully insured for hazard and flood insurance in accordance with the mortgage agreement and PUD Rider.  Prior to January 1, 2017, the Homeowners Association maintained a master flood insurance policy that insured Sullivan's home in accordance with the mortgage agreement and PUD Rider. Thereafter, Sullivan at all times has paid for and maintained a satisfactory flood insurance policy at her own expense. Despite this, BOA forced placed flood insurance on the property in October of 2009 thereby increasing the amount of the debt owned on the loan.

125.    At all times material, BOA has been aware that the property was fully covered in both flood and hazard insurance, without any lapse in coverage at any time. Despite this fact, BOA has forced placed flood insurance on the property since 2009.

126.    The premiums charged by BOA for the forced flood insurance are staggering exceeding 13 times the premium Sullivan pays for the flood insurance personally.

127.    Sullivan on multiple occasions informed BOA, and provided proof, that the property was fully insured for flood and hazard insurance. On or about December 17, 2017, Sullivan received a letter addressed to her from BOA stating that they did not have proof of hazard insurance on the property.  In response Sullivan sent BOA multiple written correspondences, including on February 7, 2020, February 19, 2020, providing them full proof of hazard insurance and flood insurance for the property.  Additionally, Sullivan informed BOA of its error in force placing flood insurance on the property since 2009 and demanding the charges against the loan's escrow account be reversed, as the property had been fully covered.  BOA ignored Sullivan's

communications and continue to charge forced placed flood insurance on the property.[22]  From 2009 to 2017, BOA has increased the debt owed on Sullivan's mortgage by $21,273.08 in unnecessary and illegal forced placed flood insurance.[23]

## I.   TILA and BOA's Account Statements

128.    BOA generally fails to provide accurate or timely information to borrowers concerning their accounts. Among other things, BOA's variable rate disclosure notices, which it is required to send borrowers pursuant to TILA, 15 U.S.C. § 1601, *et seq.*, do not account for property inspection fees, and force-placed insurance charges BOA wrongfully charges.  BOA fails to provide accurate variable rate disclosures because its imposition of improper fees renders its disclosures inaccurate.

129.    Plaintiff received a TILA disclosure on January 16, 2020, resetting her interest rate beginning on March 1, 2020 from 5.375% to 4.250%. The disclosed interest rate is inaccurate, because it does not account for the improper fees she has been charged, as detailed herein.

130.    The structure of BOA's account and transaction statements makes it extremely difficult or impossible to determine the loan balance, associated fees and charges, and how they are calculated.

131.    Account statements contain a category of fees assessed, called "Other," which provides no indication of what charges are included in the amount. When Plaintiff requested her transaction records to figure out what she owes, she has been given printouts with staggered, overlapping rows of columns that would be difficult for a financial expert to decipher, let alone a layperson. They contain and calculations that are uncategorized, conflicting, and generally

---

[22] Sullivan has made repeated demands to BOA, pursuant to federal statutes, for proof of the forced placed insurance policies which have gone unanswered.
[23] BOA has not provided Sullivan with records reflecting charges beyond 2017 for forced placed flood insurance.

misleading.  In addition, when an improper charge is finally credited by BOA, it does not properly credit the amount is has added to the loan.  BOA only credits the principal amount of the charge and not the accrued interest it has added to the loan though it improper charges.  BOA's statements do not allow ordinary customers any reasonable way to determine what they are being charged and why, how their payments are being assessed and credited, and what they should rightfully have to pay.

## TOLLING OF STATUTES OF LIMITATIONS

132.    Plaintiff's claims herein are subject to equitable tolling, stemming from Plaintiff's inability to obtain vital information underlying their claims. Any applicable statutes of limitation are properly tolled because Plaintiff did not know and could not have learned the true facts underlying her claims until shortly before filing their Complaint, including as a result of the investigation of counsel.

133.    Plaintiff and the members of the Classes were or have been unable to obtain vital information bearing on their claims absent any fault or lack of diligence on their part. As further set forth below, Plaintiff was not on inquiry notice of Defendants' wrongdoing and had no duty to initiate an investigation of any nature because the charges for property inspection and forced placed insurance fees were represented by Defendants to be legitimate. Plaintiff did not and could not have known of Defendants' violations of applicable consumer law, breaches of her contracts or unjust enrichment.

134.    Plaintiff was relieved of any duty to investigate because she reasonably and justifiably relied on Defendants to comply with applicable consumer law and contractual obligations.  Even assuming there had been some indication of wrongdoing (which there was not),

and Plaintiff had attempted to investigate, such investigation would have been futile because it would not have uncovered the true, unlawful nature of Defendants' activities.

135.     Plaintiff and members of the Classes did not discover and could not have discovered, despite all due diligence, that the property inspection and fees for forced placed insurance charged to their accounts were unfair and excessive. Plaintiff and members of the Classes did not discover and could not have discovered, despite all due diligence, the schemes alleged herein. Plaintiff's claims were thus equitably tolled until she discovered the true facts underlying her claims shortly before the filing of the Complaint.

136.     Moreover, Defendants knowingly and intentionally engaged in conduct solely calculated to induce Plaintiff to refrain from or postpone the commencement of an action.

137.     Further, Plaintiff's claims are subject to the continual accrual and/or continuous violation doctrines. Defendants engaged in continuous and repetitive violations of applicable consumer law and breaches of contract and, as such, the limitations period for Plaintiff's claims accrue only upon the last of the Defendants' unfair and/or illegal acts.

## **CLASS ACTION ALLEGATIONS**

138.     Plaintiff brings this action individually and on behalf of all individuals similarly situated pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of the following classes:

"The National Property Inspection Fee Class"

All persons in the United States or any United States Territory who were charged one or more property inspection fees through BOA's automated loan servicing platform, when they inhabited the property to be inspected and BOA was aware and on notice the property was inhabited.

"The Florida Property Inspection Fee Subclass"

All Florida individuals who own property encumbered by a mortgage serviced by BOA who were charged one or more property inspection fees through BOA's automated loan servicing platform, when they inhabited the property to be inspected and BOA was aware and on notice the property was inhabited.

"The National Forced Placed Insurance Class"

All persons in the United States or any United States Territory who have or had Mortgage with BOA within the applicable statute of limitations, who were charged for a force-placed insurance policy procured through BOA or its affiliates, entities, or subsidiaries.

"The Florida Forced Placed Insurance Class"

All Florida individuals who own property encumbered by a mortgage serviced by BOA, within the applicable statute of limitations, who were charged for a force-placed insurance policy procured through BOA or its affiliates, entities, or subsidiaries.

139.    Plaintiff and Class Members reserve the right to amend the Class definitions as discovery proceeds and to conform to the evidence. Excluded from the Classes are Defendants, and any subsidiary or affiliate of Defendants, and the directors, officers and employees of Defendants or their subsidiaries or affiliates, and members of the federal judiciary.

140.    Under Fed. R. Civ. P. 23(a)(1), the proposed class is made up of at least 40 persons, the joinder of whom are impracticable except by means of a class action.  The disposition of the claims in a class action will benefit both the parties and the Court.  The exact number of class members can be ascertained through discovery and review of Defendants' business records.

141.    The proposed class is ascertainable because it is defined by reference to objective criteria.  In addition, and upon information and belief, the names and addresses of all members of the proposed class can be identified in business records maintained by Defendants.

142.    In conformance with Fed. R. Civ. P. 23(a)(2), all Class Members' claims (including Plaintiff's) are unified in that they arise from the same improper charging and collection practices

arising out of materially identical circumstances. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the proposed class.

143.   Consistent with Fed. R. Civ. P. 23(a)(3), Plaintiff is a member of the Class. Her claims are typical of all other Class Members.  All Class Members' claims are unified, as all were victims of the same collection and charging practices.

144.   Consistent with Fed. R. Civ. P. 23(a)(4), Plaintiff will adequately represent the class because she has interests in common with the proposed Class Members and she has retained attorneys who are experienced in class action litigation.

145.   Pursuant to Fed. R. Civ. P. 23(b)(3), there is a well-defined community of interest in the questions of law and fact involving and affecting the class to be represented by Plaintiff. Common questions of law and/or fact predominate over any questions affecting only individual members of the class.  Common questions include, but are not limited to, the following:

a.   Whether BOA charged for unnecessary insurance coverage including, but not limited to insurance coverage that violated the borrowers' mortgage;

b.   Whether BOA breached its mortgage contracts with Plaintiff and the Class Members by charging them for force-placed insurance that included illegal kickbacks (including unwarranted commissions or qualified expense reimbursements, and reinsurance payments) and by charging Plaintiff and the Class Members for servicing their loans;

c.   Whether BOA has been unjustly enriched at the expense of the Plaintiff and the Class Members;

d.   Whether BOA manipulated forced-placed insurance purchases in order to maximize their profits to the detriment of Plaintiff and the Class Members;

e.  Whether BOA violated TILA by failing to disclose kickbacks charged to Plaintiff and the Class Members in their mortgages;

f.  Whether BOA violated TILA by requiring unnecessary and/or excessive amounts of flood insurance;

g.  Whether BOA had a policy and practice of charging persons in arrears unlawful and unreasonable inspection fees;

h.  Whether Plaintiffs and Class Members are entitled to statutory damages under the TILA and the amounts thereof;

i.  Whether and to what extent BOA's automated servicing platform improperly ordered and charged inspection fees to Class Members;

j.  Whether Defendants BOA and Safeguard, each independent entity (including their directors, employees, agents and affiliated entities), when acting in concert to effectuate the Property Inspection Fee Scheme are an enterprise, as defined by 18 U.S.C. § 1961(4);

k.  Whether Defendants' Property Inspection Fee scheme, as alleged herein, is illegal;

l.  Whether BOA and/or Safeguard (including their directors, employees, agents and affiliated entities) engaged in a pattern or practice of racketeering, as alleged herein;

m.  Whether BOA and/or Safeguard (including their directors, employees, agents and affiliated entities) was a member of, or participant in, the conspiracy alleged herein;

n.  Whether Plaintiffs and Class Members are entitled to statutory damages under

the FCCPA and the amounts thereof;

o.  Whether BOA's unauthorized and inflated charges routinely led to inaccurate loan balances, in violation of TILA;

p.  Whether Plaintiffs and Class Members are entitled to statutory damages under the TILA and the amounts thereof;

q.  Whether notices of changes in interest rates were in violation of the contract terms contained in the adjustable rate notes;

r.  Whether the Court can enter declaratory and injunctive relief; and

s.  The proper measure of disgorgement and/or actual and/or punitive damages and/or restitution, as well as other recovery to the class, including fees and costs;

146.  Further, the prosecution of separate actions by individual members of the class would create a risk of:

a.  Inconsistent or varying adjudications concerning individual members of the class that would establish incompatible standards of conduct for the defendant opposing the class; and

b.  Adjudication with respect to individual members of the class that would, as a practical matter, be dispositive of the interests of other members not parties to such adjudications, and/or substantially impair or impede the ability of other non-party class members to protect such individual interests.

147.  The class action method is appropriate for the fair and efficient prosecution of this action.

148.  Individual litigation of all claims that might be asserted by all class members would produce such a multiplicity of cases that the judicial system, having jurisdiction of the claims,

would remain congested for years. Class treatment, by contrast, provides manageable judicial treatment calculated to bring a rapid conclusion to all litigation of all claims arising out of the conduct of the Defendants.

149.    The certification of the class would allow litigation of claims that, in view of the expense of the litigation, may be an insufficient amount to support separate actions.

## CLAIMS FOR RELIEF

## COUNT I

### BREACH OF CONTRACT
(**On behalf of Plaintiff, The National Property Inspection Fee Class and The National Forced Placed Insurance Class Against BOA**)

150.    Plaintiff repeats and realleges paragraphs 1 through 137 as if fully stated herein.

151.    Plaintiff brings this cause of action on behalf of herself and the members of the National Property Inspection Fee Class and the National Forced Placed Insurance Class.

152.    The mortgage encumbering Plaintiff's and the Members of the Classes' homes are owned and/or guaranteed by Fannie Mae or Freddie Mac.

153.    The mortgage contracts at issue all use the standard Fannie Mae/Freddie Mac Uniform Security Instrument with language substantially similar to the language identified herein.

154.    The mortgage contracts dictate that where the Loan Servicer or Lender acts to protect the property, the Loan Servicer and/or Lender are obligated to do so only in a manner that is "reasonable and appropriate."

155.    The mortgage loans for Plaintiff and the Members of the Classes are all serviced by BOA.

156.    As the Loan Servicer, BOA acquired and/or retains certain contractual rights and obligations including compliance with the terms of Paragraphs 7 and 9 of the mortgage contracts.

157.     BOA, as described herein, ordered numerous drive-by or fabricated property inspections that often occurred at a rate in excess of once every 30 days.  BOA charged Plaintiff for each of these inspections whether they were actually completed or not.

158.      The inspections were neither reasonable nor appropriate, conducted from an off-site vantage point or not at all.  Additionally, frequency of these inspections was excessive.  BOA knew at the time the inspections were ordered that Plaintiff inhabited her home which secured the mortgage.

159.     BOA charged Plaintiff for these excessive and unfair property inspections.

160.     BOA breached Plaintiffs' mortgage contracts by charging Plaintiff for property inspections that Plaintiff was not required to pay for by the terms of her mortgage contract. These charges were not "reasonable and appropriate."

161.     BOA breached Plaintiff's mortgage contract by charging Plaintiff inflated property inspection fees due to the portion of the charge that was retained by BOA and/or Safeguard.

162.     Moreover, BOA breached Plaintiff and the Members of the National Forced Placed Insurance Class' mortgage agreements by charging Plaintiff and the Class Members for forced placed flood insurance that was unnecessary and excessive. BOA further breached these mortgage agreements by not providing Plaintiff and the Class Members with rebates on the costs of coverage there by charging them for more than the actual cost of the insurance.

163.     As the direct, proximate, and legal result of these breaches of the express terms of the contract, Plaintiff and the Members of the Classes have suffered damages and are entitled to the relief sought herein for such breaches.

## COUNT II

**BREACH OF THE IMPLIED COVENANT OF GOD FAITH AND FAIR DEALING**
**(On behalf of Plaintiff, The National Property Inspection Fee Class and The National**
**Forced Placed Insurance Class Against BOA)**

164.    Plaintiff repeats and realleges paragraphs 1 through 137 as if fully stated herein.

165.    Plaintiff brings this cause of action on behalf of herself and the members of the National Property Inspection Fee Class and the National Forced Placed Insurance Class.

166.    Every contract contains an implied covenant of good faith and fair dealing.

167.     In all of their actions described herein, BOA acted on its own behalf.

168.    The mortgage contracts of Plaintiff and the Classes contained an implied covenant of good faith and fair dealing, pursuant to which BOA was bound to exercise the discretion afforded it under the mortgage contract in good faith and to deal fairly with Plaintiff and the Classes.

169.    BOA's duty of good faith and fair dealing prevents it from evading the spirit of the mortgage contract by exercising discretion afforded it to order unnecessary property inspections and charge borrowers excessive fees for property inspections; and/or force placing excessive and unnecessary flood insurance and/or flood insurance.

170.    Any discretionary authority granted to BOA under the terms of the mortgage contracts was subject to BOA's implied duty of good faith and fair dealing.

171.    BOA breached its duty of good faith and fair dealing in at least the following respects, among others:

      a.    Using an automated system that did not adequately consider the necessity for any given inspection;

b. Ordering a property inspection more frequently than required to perpetuate Class Member's loan delinquency;

c. Imposing charges for property inspections on the Class Members that are not permitted by applicable law or regulation and/or in violation of the applicable mortgage provisions;

d. Charging for property inspections which were not completed;

e. Charging for property inspections that were conducted from off-site vantage points, behind the wheel of an automobile, lasting a minute or less in duration;

f. Charging for forced placed flood insurance on the Class Members that are not permitted by applicable law or regulation and/or in violation of the applicable mortgage provisions;

g. Exercising its discretion to choose a force-placed insurance policy in bad faith and in contravention of the parties' reasonable expectations, by purposefully selecting force-placed insurance policies with artificially inflated charges to maximize its own profits; and

h. Assessing inflated and unnecessary insurance policy charges against the Class Members and misrepresenting the reason for the cost or the need of the policies;

172.    As the direct, proximate, and legal result of these breaches of the implied covenant of good faith and fair dealing, Plaintiff and the Members of the Classes have suffered damages and are entitled to the relief sought herein for such breaches.

## COUNT III

### UNJUST ENRICHMENT[24]
**(On behalf of Plaintiff, The National Property Inspection Fee Class Against All Defendants and The National Forced Placed Insurance Class Against BOA)**

173.    Plaintiff repeats and realleges paragraphs 1 through 137 as if fully stated herein.

174.    Plaintiff brings this cause of action on behalf of herself and the members of the National Property Inspection Fee Class and the National Forced Placed Insurance Class.

175.    As a result of the Property Inspection Fee Scheme, BOA and Safeguard improperly charged unnecessary property inspection fees to Plaintiff and the Class Members at an inflated price, and earned money and fees that were unreasonable.

176.    As a result of the Forced Placed Insurance Fee Scheme BOA improperly charged fees to the Members of the Class for unnecessary and excessive flood insurance and/or hazard insurance, and earned money and fees that were unreasonable

177.    Further BOA was unjustly enriched through financial benefits in the form of increased interest income and other fees that resulted when the amounts of the forced placed insurance policies were added to the Class Members' loan balances.

178.    BOA and Safeguard are aware if the receipt of the above-described benefits.

179.    BOA and Safeguard received the above-described benefits to the detriment of Plaintiff and each Member of the Classes.

180.    BOA and Safeguard will be unjustly enriched if they are allowed to retain the aforementioned benefits, and each Member of the Classes is entitled to recover the amount by which BOA and Safeguard was unjustly enriched at his or her expense.

---

[24] Plaintiff pleads her unjust enrichment claim against BOA in the alternative to her contractual claims against them.

## COUNT IV

**FLORIDA CONSUMER COLLECTION PRACTICES ACT § 559.72(9), FLA. STAT**
**(On behalf of Plaintiff, The Florida Property Inspection Fee Subclass and The Florida**
**Forced Placed Insurance Subclass Against BOA)**

181.     Plaintiff repeats and realleges paragraphs 1 through 137 as if fully stated herein.

182.     Plaintiff brings this cause of action on behalf of herself and the members of the Florida Property Inspection Fee Class and the Florida Forced Placed Insurance Class.

183.     Section 559.72, Florida Statutes, of the FCCPA mandates that "no person" shall engage in certain practices in collecting consumer debts.

184.     BOA is a "person" within the meaning of the FCCPA.

185.     The mortgage loans encumbering the properties of Plaintiff and the Members of the Classes, are all being serviced by BOA, and are each a "debt" under the FCCPA because each one is "an[] obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment." § 559.55(6), Fla. Stat.

186.     The FCCPA creates a private right of action. See § 559.77, Fla. Stat.

187.     The Florida Legislature created shared, substantive statutory rights of Plaintiff and the Members of the Classes to be enforced and protected privately under the FCCPA, which BOA violated. §§ 559.72, 559.72(9), 559.77, Fla. Stat.

188.     Under Section 559.72, Florida Statutes,

In collecting consumer debts, no person shall:

……

(9) Claim, attempt, or threaten to enforce a debt when such person knows that the debt is not legitimate or assert the existence of some other legal right when such person knows that the right does not exist.

189.    Based on the foregoing allegations, BOA violated Section 559.72(9), Florida Statutes, by attempting to collect Escrow Account Advances (which contained illegal fees for unnecessary and duplicative flood insurance), and the fees for Property Inspections that were not conducted, excessive, and not permitted, when, as stated above, it knew that the fees, and as a corollary, the total amounts incorporating them, were not legitimate debts.

190.    Based on the foregoing allegations, BOA violated Section 559.72(9), Florida Statutes, by attempting to collect Escrow Account Advances (which contained illegal fees for unnecessary and duplicative flood insurance), and the fees for Property Inspections that were not conducted, excessive, and not permitted, when, as stated above, it knew it had no legal right to collect the fees, and as a corollary, no legal right to collect the total amounts incorporating them.

191.    These violations of FCCPA caused injury to Plaintiff and the Members of the Subclasses by violating the foregoing substantive FCCPA rights.

192.    As a result of these violations, Plaintiff and Members of the Subclasses are entitled to statutory damages together with reasonable attorney's fees and costs under Section 559.77, Florida Statutes.

## COUNT V

**VIOLATIONS OF THE FAIR DEBT COLLECTION PRACTICES ACT,**
**15 U.S.C. § 1692, et seq.**
**(On behalf of Plaintiff, The National Property Inspection Fee Class and The National Forced Placed Insurance Class Against BOA)**

193.    Plaintiff repeats and realleges paragraphs 1 through 137 as if fully stated herein.

194.    Plaintiff brings this cause of action on behalf of herself and the members of the National Property Inspection Fee Class and the National Forced Placed Insurance Class.

195.    Plaintiff and the Members of the Classes are a "consumer" as defined by 15 U.S.C. § 1692a(3).

196.    The mortgage loans encumbering the properties of Plaintiff and the Members of the Classes, which BOA service, are debts under the Fair Debt Collection Practices Act ("FDCPA") because each is "an[] obligation or alleged obligation of a consumer to pay money arising out of a transaction . . . [that is]…primarily for personal, family, or household purposes." 15 U.S.C. § 1692a(5).

197.    BOA is a "debt collector" of those mortgage loans as defined by 15 U.S.C. § 1692a(6) because it regularly attempts to collect, and collects, amounts owed or asserted to be owed or due another, including the mortgage debts from Plaintiff and the Members of the Class via monthly loan statements or payoff statements. These statements are uniform in form and layout and are sent using the instrumentalities of interstate commerce in connection with the business of collecting a debt.  Furthermore, these statements universally identify BOA as a debt collector.

198.    BOA engaged in direct "communications" with Plaintiff and the Members of the Classes as defined by 15 U.S.C. § 1692a(2) when it sent them or their representatives monthly loan statements or payoff statements, purportedly demanding money due for reinstatement or payoff of their mortgage loans.

199.    The FDCPA creates a private right of action under 15 U.S.C. § 1692k.

200.    Congress created shared, substantive statutory rights of Plaintiff and the Members of the Classes to be privately enforced and protected under the FDCPA, which BOA has violated. *See* 15 U.S.C. §§ 1692, 1692e, 1692f.

201.    15 U.S.C. §1692e states, in relevant part,

> A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt.

Without limiting the general application of the foregoing, the following conduct is a violation of this section:

……

(2) The false representation of—
(A) the character, amount, or legal status of any debt; or
(B) any services rendered or compensation which may be lawfully received by any debt collector for the collection of a debt.
………

(10) The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer.

202. 15 U.S.C. § 1692f states, in relevant part,

A debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:

(1) The collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law

203. Based on the foregoing allegations, BOA violated 15 U.S.C. § 1692e(10) as it used deceptive means of collecting debts—which contained illegal fees for unnecessary flood insurance and/or improper and unnecessary property inspection fees as heretofore described; representing in monthly loan statements and payoff statements, these fees for recurring gratuitous property inspections, ordered and scheduled by automated means, and/or excessive and unnecessary forced placed insurance, in a confusing, inaccurate manner, or in a manner that would likely mislead a consumer.

204. Based on the foregoing allegations, BOA violated 15 U.S.C. § 1692e(2)(A) because through its monthly loan statements or payoff statements imposing charges for unnecessary flood insurance and/or improper and unnecessary property inspection fees; BOA represented falsely or in a misleading manner stated, or mispresented, the amount, character, or status of the amounts needed to payoff Plaintiff's and the Members of the Classes' mortgage debts.

205.     Based on the foregoing allegations, BOA violated 15 U.S.C. § 1692e(2)(B) when through its monthly loan statements or payoff statements imposing charges for unnecessary flood insurance and/or improper and unnecessary property inspection fees; BOA represented falsely or in a misleading manner stated, or mispresented, the compensation that it might lawfully receive from Plaintiff and the Members of the Classes.

206.     Based on the foregoing allegations, BOA used unfair means of collecting amounts for unnecessary flood insurance and/or improper and unnecessary property inspection fees, in violation of 15 U.S.C. § 1692f, because the amounts were not expressly authorized by Plaintiff's and the Members of the Classes' mortgage instruments creating their debts, as they must be under those instruments, or they were not permitted by law.

207.     These violations of FDCPA caused injury to Plaintiff and the Members of the Classes by violating the foregoing substantive FDCPA rights.

208.     As a direct and proximate result of these violations, Plaintiff and the Members of the Classes are entitled to statutory damages together with reasonable attorney's fees and costs under 15 U.S.C. § 1692(k).

## COUNT VI

**VIOLATIONS OF THE TRUTH IN LENDING ACT, 15 U.S.C. § 1601, et seq.**
**(On behalf of Plaintiff, The National Property Inspection Fee Class and The National Forced Placed Insurance Class Against BOA)**

209.     Plaintiff repeats and realleges paragraphs 1 through 137 as if fully stated herein.

210.     Plaintiff brings this cause of action on behalf of herself and the members of the National Property Inspection Fee Class and the National Forced Placed Insurance Class.

211.     Plaintiff's and the Members of the Classes' mortgages were consumer credit plans secured by their principal dwellings and were subject to the disclosure requirements of the Truth

in Lending Act ("TILA"), 15 U.S.C.§ 1601, *et seq.*, and all related regulations, commentary, and interpretive guidance promulgated by the Federal Reserve Board.

212.    BOA is a "creditor" as defined by TILA because it owned and/or serviced Plaintiff's mortgage and changed the terms of the mortgage so as to create a new mortgage obligation, of which BOA was the creditor.

213.    Pursuant to TILA, BOA was required to accurately and fully disclose the terms of the legal obligations between the parties. *See* 12 C.F.R. § 226.17(c).

214.    BOA violated TILA, specifically 12 C.F.R. § 226.17(c), when it: (i) added force-placed insurance charges to Plaintiff's mortgage obligations and failed to provide new disclosures; and (ii) failed at all times to disclose the amount and nature of the kickbacks, reinsurance, discount mortgage servicing, and other profiteering involving BOA and/or its affiliates as a result of the purchase of force-placed insurance.

215.    When BOA changed the terms of Plaintiff's mortgages to allow previously unauthorized kickbacks and insurance amounts in excess of its interests in the property, it changed the finance charge and the total amount of indebtedness, extended new and additional credit through force-placed insurance charges, and thus created a new debt obligation. Under TILA, BOA was then required to provide a new set of disclosures showing the amount of the insurance charges (i.e. finance charges) and all components thereof. On information and belief, BOA increased the principal amount under Plaintiff's mortgage when it force-placed the insurance, which was a new debt obligation for which new disclosures were required.

216.    BOA adversely changed the terms of Plaintiff's loan after origination in order to allow a kickback on the force-placed insurance charges.  These kickbacks are not authorized in the mortgage in any clear and unambiguous way. BOA never disclosed to borrowers the amount of

the "commissions," "expense reimbursements," or other unearned profits paid to them or their affiliate.

217.    BOA also violated TILA by adversely changing the terms of Plaintiff's loan after origination by requiring and threatening to force-place more insurance than necessary to protect its interest in the property securing the mortgage.

218.    BOA also violated TILA through the imposition of unauthorized or inflated Property Inspections and other charges set forth herein, BOA fails to accurately disclose an accurate and proper loan balance to Plaintiff and the Members of the Classes.  As a result. BOA's TILA disclosures to TILA Plaintiff states loan balances that are higher than they would have been but for BOA's improper charges.

219.    Acts constituting violations of TILA occurred within one year prior to the filing of the original Complaint in this action, or are subject to equitable tolling because BOA's kickbacks, reinsurance, and other unearned revenue-generating scheme was the subject of secret agreements among it and its affiliates and was concealed from borrowers.

220.    Plaintiff and the Members of the Classes have been injured and have suffered a monetary loss arising from BOA's violations of TILA.

221.    As a result of BOA's TILA violations, Plaintiff and the Members of the Classes are entitled to recover actual damages and a penalty of $500,000.00 or 1% of BOA's net worth, as provided by 15 U.S.C. § 1640(a)(1)-(2).

222.    Plaintiff and the Members of the Classes are also entitled to recovery of attorneys' fees and costs to be paid by BOA, as provided by 15 U.S.C. § 1640(a)(3).

## COUNT VII

**VIOLATIONS OF FLORIDA'S UNFAIR AND DECEPTIVE TRADE PRACTICES ACT**
**FLA. STAT. §§ 501.201, et seq.**
**(On behalf of Plaintiff, The Florida Property Inspection Fee Subclass Against All**
**Defendants and The Florida Forced Placed Insurance Subclass Against BOA)**

223.    Plaintiff repeats and realleges paragraphs 1 through 137 as if fully stated herein.

224.    Plaintiff brings this cause of action on behalf of herself and the members of the Florida Property Inspection Fee Class and the Florida Forced Placed Insurance Class.

225.    Florida's Unfair and Deceptive Trade Practices Act (Fla. Stat. §§ 501.201, *et seq*.) prohibits unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce.

226.    A practice is "deceptive" within the meaning of Florida's Unfair and Deceptive Trade Practices Act if it is likely to mislead consumers.

227.    The issuance of fees for unauthorized services in connection with loan servicing constitutes an unfair and deceptive practice within the meaning of Florida's Unfair and Deceptive Trade Practices Act.

228.    In the course and conduct of BOA's loan servicing and collection and in violation of Florida's Unfair and Deceptive Trade Practices Act and federal law, Defendants used false, deceptive, confusing and misleading statements, and failed to disclose and/or omitted material facts, concerning the propriety of certain fees and services that were automatically ordered and charged to the Members of the Classes as well as the fraudulent and self-dealing nature of BOA's business relationship with Safeguard.

229.    Specifically, BOA individually and collectively with its affiliates led consumers to believe that certain distressed mortgage loan fees including but not limited to, forced placed insurance policies  fees for property inspections and other services, were authorized by their

mortgage documents and appropriately priced when, in reality, the fees were inflated due to BOA's self-dealing business relationship with Safeguard and other affiliates and were for services that were unauthorized, duplicative, provided no benefit to the consumer, and/or were never performed.

230.    Defendants' false, deceptive, confusing and misleading statements and omissions are likely to mislead consumers into believing that BOA's Property Inspection Fees and Forced Placed Insurance Fees are appropriately priced and/or authorized when, in fact, they are not.

231.    Asa direct and proximate result of Defendants' violations of Florida's Unfair and Deceptive Trade Practices Act (Fla. Stat. §§ 501.201, *et seq*.) Plaintiff and each Member of the Florida Property Inspection Fee Class and the Florida Forced Placed Insurance Class have suffered damages and substantial injury to a number of legally protected interests, including injury to their business and/or property.

232.    Defendants are liable to Plaintiff and each Member of the Florida Property Inspection Fee Class and the Florida Forced Placed Insurance Class for damages, together with all costs of this action plus reasonable attorney's fees, as provided under Fla. Stat. Ann. § 501.211, and § 501.2105.

233.    Further, pursuant to Fla. Stat. Ann. § 501.211, Plaintiff and each Member of the Florida Property Inspection Fee Class and the Florida Forced Placed Insurance Class seek an order from this Court declaring Defendants' acts and practices to be unlawful and enjoining Defendants from continuing their unfair, unlawful, and/or deceptive business acts and/or practices in the State of Florida and elsewhere, as well as any other injunctive or declaratory relief as the Court deems appropriate.

**COUNT VIII**

**VIOLATIONS OF 18 U.S.C. § 1962(C)-(D) THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1961, et seq.**
**(On behalf of Plaintiff, and The National Property Inspection Fee Class Against All Defendants)**

234.    Plaintiff repeats and realleges paragraphs 1 through 137 as if fully stated herein.

235.    Plaintiff brings this cause of action on behalf of herself and the members of the National Property Inspection Fee Class.

236.    At all relevant times, Defendants have been "persons" under 18 U.S.C. § 1961(3) because they are capable of holding, and do hold, "a legal or beneficial interest in property."

237.    Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

238.    Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions. 18 U.S.C. § 1962(d).

239.    As explained in detail above (Section D) and below, at all relevant times, in violation of 18 U.S.C. § 1962(c) and (d), Defendant BOA, including its directors, employees, and agents, along with the Defendant Safeguard including their directors, employees, and agents, and their subcontracted property inspectors, conducted the affairs of an associated-in-fact enterprise, as that term is defined in 18 U.S.C. § 1961(4) (consistent with the definition above in Section D, the "BOA Property Inspection Enterprise").

### A. Description of the BOA Property Inspection Enterprise

240.    In addition to above incorporation of allegations, Plaintiff expressly incorporates by reference the allegations contained in each of the paragraphs within Section D, above, as though fully set forth herein.

241.    RICO defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 17 18 U.S.C. § 1961(4).

242.    An association-in-fact enterprise requires three structural features: (1) a purpose; (2) relationships among those associated with the enterprise; and (3) longevity sufficient to permit those associates to pursue the enterprise's purpose. *See Boyle v. United States*, 556 U.S. 938, 946 (2009).

243.    The BOA Property Inspection Enterprise is an ongoing, continuing group or unit of persons and entities associated together for the common purpose of limiting costs and maximizing profits of the otherwise independent members of the enterprise by conducting unfair, illegal and excessive property inspections whether they are needed or not and collecting unearned and marked-up fees in the process, facilitated through use of the mail and wires of the United States.

244.    The BOA Property Inspection Enterprise consisted of the following entities and individuals: (a) Bank of America, N.A., its subsidiaries, executives, employees, and agents; (b) Safeguard Properties Management LLC, its subsidiaries, executives, employees, and agents; and (c) their affiliated third-party subcontracted property preservation vendors and/or property inspectors. The enterprise alleged in this paragraph shall be referred to as the "BOA Property Inspection Enterprise."

245.    At all relevant times, the BOA Property Inspection Enterprise constituted a single "enterprise" or multiple enterprises within the meaning of 18 U.S.C. § 1961(4), as legal entities, as well as individuals and legal entities associated-in-fact for the common purpose of engaging in the Defendants' illicit profit-making scheme.

246.    The members of the BOA Property Inspection Enterprise and their co-conspirators, through their illegal enterprise, engaged in a pattern of racketeering activity, which, as described above, involved a fraudulent scheme to increase revenue for the members of the enterprise and the other entities and individuals associated-in-fact with the BOA Property Inspection Enterprise's activities by conducting unfair and excessive property inspections whether they are needed or not, and collecting unearned and marked-up fees in the process (consistent with the definition above in Section D, "Inspection Fee RICO Scheme"). *See Weiner v. Ocwen Fin. Corp.*, No. 2:14-cv-02597-MCE-DAD, 2015 WL 4599427, at *10 (E.D. Cal. July 29, 2015) ("*Weiner*").

## B. The BOA Property Inspection Enterprise Sought to Fraudulently Increase Defendants' Profits and Revenues

247.    Each member of the BOA Property Inspection Enterprise benefited financially from the Inspection Fee RICO Scheme. BOA received fees paid by defaulting borrowers for each property inspection it ordered as well as any additional associated fees, such as late payment fees issued to borrowers who were often unaware of the inspection fees that were charged to their account; the Safeguard entities benefit from the scheme by charging marked-up property inspection fees, in the form of 'service' charges, that they pocket as profit; and third party property inspection vendors and/or property inspectors affiliated with Defendants profit from the scheme by completing dubious and unnecessary drive-by or fabricated inspections, for which Safeguard pays them, whether those inspections were conducted or not.

248.    The BOA Property Inspection Enterprise engaged in, and its activities affected, interstate and foreign commerce because it involved commercial activities across state boundaries, including but not limited to: (1) the marketing, promotion, and advertisement of Defendants' services; (2) the issuance of fees, bills, and statements demanding the payment of fees to defaulting borrowers located across the country, and the receipt of monies for payment of the same; (3) the issuance of property inspection orders for properties located throughout the country; (4) the actual inspection of those properties; and (5) impacting the nation-wide market for mortgages through a scheme designed to encourage default.

249.    Within the BOA Property Inspection Enterprise, there was a common communication network by which Defendants and their co-conspirators shared information on regular basis. The BOA Property Inspection Enterprise used this common communication network for ordering, billing for, and conducting the property inspections described herein. Indeed, every property inspection ordered by BOA is issued through an automated and computerized loan-servicing platform that communicates through the interstate wires directly to a similar servicing-platform at Safeguard, which issues a similar order to third party inspection vendors and/or property inspectors who use the same communication network to issue reports and chare for the inspections, whether they have been completed or not.

250.    Each participant in the BOA Property Inspection Enterprise has systematic linkages to each other through corporate ties, contractual relationships, financial ties, and a continuing coordination of activities. The Safeguard entities acquired the exclusive right to process and execute the default-related services which are the subject of this complaint, including acquiring all of BOA's facilities and employees who previously performed those functions, but the arrangement between BOA and Safeguard, and their affiliated third-party property inspection vendors is also

laid out in additional contractual arrangements between each of the members of the BOA Property Inspection Enterprise and in the ongoing unwritten agreements between the individuals in the enterprise to continue performing, billing for, and collecting for supposed "inspections" that each of them knew were repetitive, unnecessary, and designed not to protect any valid property interest of the lender (in this instance BOA), but instead to enrich the members of the enterprise.

251.    Through the BOA Property Inspection Enterprise, Defendants and their co-conspirators functioned as a continuing unit with the purpose of furthering the Inspection Fee RICO Scheme.

252.    Each Defendant participated in the operation and management of the BOA Property Inspection Enterprise by directing its affairs as described herein. While Defendants participated in, and are members of, the enterprise, they have an existence separate from the enterprise, including distinct legal statuses, different affairs, different offices and roles, officers (with certain exceptions), directors (with certain exceptions), employees, individual personhood, and reporting requirements. BOA's participation in the BOA Property Inspection Enterprise is distinct from its own affairs as a loan servicer. Safeguard's participation in the BOA Property Inspection Enterprise is also distinct from their own affairs as a facilitator of property preservation services to loan servicers.

253.    Defendants and their co-conspirators exerted substantial control over the BOA Property Inspection Enterprise, and participated in the affairs of the enterprise by: (a) negotiating and entering into agreements which permitted and facilitated the members of the Enterprise to engage in operating automated servicing platforms which issue property inspection orders and/or property inspection confirmations; (c) issuing property inspection orders and or property inspection confirmations; (d) misrepresenting and/or concealing the existence, amount, legality or

purpose of property inspections and/or related fees; (e) misrepresenting and/or concealing whether and when property inspections are permitted by the terms of a borrower's mortgage agreement; (f) misrepresenting and/or concealing fees charged in connection with property inspections; (g) artificially inflating and demanding payment for inflated fees charged in connection with those property inspections; (h) misrepresenting and/or concealing mark-ups included in fees charged in connection with property inspections; (i) issuing demands for and collecting payment for property inspections and their associated fees; (j) issuing and accepting confirmations that property inspections were completed, whether they were completed or not; (k) misrepresenting and/or concealing the true nature of the relationship and agreements between the members of the BOA Property Inspection Enterprise; and (l) ensuring that members of the BOA Property Inspection Enterprise, and unnamed co-conspirators, complied with and concealed the fraudulent Inspection Fee RICO Scheme.

254.    Without the willing participation of each member of the BOA Property Inspection Enterprise, the Inspection Fee RICO Scheme and common course of conduct would not have been successful.

255.    The members of the BOA Property Inspection Enterprise directed and controlled the ongoing organization necessary to implement the scheme at meetings and through communications of which Plaintiff cannot fully know at present, because such information lies in the Defendants' and others' hands.

### C.  Predicate Acts: Mail and Wire Fraud

256.    To carry out, or attempt to carry out, the scheme to defraud, the members of the BOA Property Inspection Enterprise, each of whom is a person associated-in-fact with the BOA Property Inspection Enterprise, did knowingly conduct or participate, directly or indirectly, in the

affairs of the BOA Property Inspection Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c), and employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

257.     Specifically, the members of the BOA Property Inspection Enterprise have committed, conspired to commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity (i.e., violations of 18 U.S.C. §§ 1341 and 1343), within the past ten years.

258.     The multiple acts of racketeering activity which the members of the BOA Property Inspection Enterprise committed, or aided or abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity."

259.     The racketeering activity was made possible by the BOA Property Inspection Enterprise's regular use of the facilities, services, distribution channels, and employees of the BOA Property Inspection Enterprise.

260.     The members of the BOA Property Inspection Enterprise participated in the scheme to defraud by using mail, telephone, and the Internet to transmit mailings and wires in interstate or foreign commerce.

261.     The members of the BOA Property Inspection Enterprise used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in service of their scheme through virtually uniform misrepresentations, concealments, and material omissions.

262.     In devising and executing the illegal scheme, the members of the BOA Property Inspection Enterprise devised and knowingly carried out a material scheme and/or artifice to

defraud Plaintiff and the Class or to obtain money from Plaintiff and the Class by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts.

263.    For the purpose of executing the illegal scheme, the members of the BOA Property Inspection Enterprise committed these racketeering acts, which number in the thousands, intentionally and knowingly with the specific intent to advance the illegal Inspection Fee RICO Scheme.

264.    The BOA Property Inspection Enterprise's predicate acts of racketeering (18 U.S.C. § 1961(1)) include, but are not limited to:

      a.    Mail Fraud: The members of the BOA Property Inspection Enterprise violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of limiting costs and maximizing profits by conducting unfair and excessive property inspections whether they are needed or not and collecting unearned and marked-up fees in the process.

      b.    Wire Fraud: The members of the BOA Property Inspection Enterprise violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to defraud and obtain money on false pretenses, misrepresentations, promises, and omissions.

265.    The members of the BOA Property Inspection Enterprise use of the mails and wires include, but are not limited to: (a) the transmission and receipt of property inspection orders; (b) the transmission and receipt of property inspection confirmations; (c) the transmission of invoices, bills and other demands for payment related to fees issued in connection with property inspections

and/or property inspection services; (d) the transmission of contracts, agreements, marketing or other materials indicating when a property inspection will be conducted and/or is permitted; and (e) the transmission of contracts, agreements, or other materials establishing the relationship between, BOA, Safeguard, and third party property inspection vendors and/or property inspectors. *See Weiner*, 2015 WL 4599427, at *10 (finding alleged receipt of specific monthly mortgage statements demanding payment for allegedly marked-up inspection fees sufficient to establish a RICO predicate act under Rule 9(b)).

266.   The members of the BOA Property Inspection Enterprise also communicated by U.S. mail, by interstate facsimile, and by interstate electronic mail with various other affiliates, regional offices, divisions, dealerships, government entities, and other third-party entities in furtherance of the scheme.

267.   The mail and wire transmissions described herein were made in furtherance of Defendants' Inspection Fee RICO Scheme and common course of conduct designed to conduct unfair and excessive property inspections whether they are needed or not and collecting unearned and marked-up fees in the process.

268.   Many of the precise dates of the fraudulent uses of the U.S. mail and interstate wire facilities have been deliberately hidden and cannot be alleged without access to Defendants' books and records. However, Plaintiff has described the types of predicate acts of mail and/or wire fraud, including certain specific dates that, through mail and wires, Defendants provided mortgage invoices, loan statements, payoff demands, or proofs of claims to Plaintiff, affirmatively demanding that they pay fraudulent and marked-up fees for default-related services. *See supra*. Defendants have also accepted payments and engaged in other correspondence in furtherance of their scheme through the mail and wire, including but not limited to accepting Plaintiff's payments

for invoices that included fraudulent and improper Property Inspection and Forced Placed Insurance Fees described in this Complaint and reflected in the Exhibits thereto.

269.    Defendants' use of the mails and wires to effectuate the Inspection Fee RICO Scheme include at least the following uses of the mails and wires on the following dates, (on information and belief, BOA's detailed transaction history entries and monthly account statements that bear the label "Other Advances" or "Property Inspection" reflect Property Inspection Fees, Plaintiff attaches a report reflecting all such entries that purport to be Property Inspection Fees including the dates and amounts provided by Defendant BOA. Said report is attached as Exhibit 2.

270.    The members of the BOA Property Inspection Enterprise have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy. In violation of 18 U.S.C. § 1962(d), the members of the BOA Property Inspection Enterprise conspired to violate 18 U.S.C. § 1962(c), as described herein. Various other persons, firms, and corporations, including third-party entities and individuals not named as defendants in this Complaint, have participated as co-conspirators with the members of the BOA Property Inspection Enterprise in these offenses and have performed acts in furtherance of the conspiracy to increase or maintain revenue, increase market share, and/or minimize losses for the Defendants and their unnamed co-conspirators throughout the illegal scheme and common course of conduct.

271.    The members of the BOA Property Inspection Enterprise aided and abetted others in the violations of the above laws.

272.    To achieve their common goals, the members of the BOA Property Inspection Enterprise hid from Plaintiff, the Classes, and the public: (1) the fraudulent nature of Defendants' property inspection services, (2) the inflated and fraudulent nature of fees charged in connection

with Defendants' property inspections and/or property inspection services; and (3) the true nature of the relationship between BOA, Safeguard, and their affiliated third party property inspectors vendors and/or property inspectors.

273.    Defendants and each member of the conspiracy, with knowledge and intent, agreed to the overall objectives of the conspiracy and participated in the common course of conduct. Indeed, for the conspiracy to succeed, each of the members of the BOA Property Inspection Enterprise and their co-conspirators had to agree to conceal their fraudulent scheme.

274.    The members of the BOA Property Inspection Enterprise knew, and intended that, Plaintiff and the Members of the Class would rely on the material misrepresentations and omissions made by them and incur increased costs as a result. Indeed, if Plaintiff and the Members of the Class did not pay Defendants' inflated fees associated with the BOA Property Inspection Enterprise's fraudulent property inspections, the Inspection Fee RICO Scheme could not have succeeded or turned a profit.

275.    As described herein, the members of the BOA Property Inspection Enterprise engaged in a pattern of related and continuous predicate acts for years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant monies and revenues from Plaintiff and the Classes based on their misrepresentations and omissions, while conducting unfair and excessive property inspections whether they are needed or not, and collecting unearned and marked-up fees in the process.

276.     The predicate acts also had the same or similar results, participants, victims, and methods of commission.

277.    The predicate acts were related and not isolated events.

278.    The true purpose of Defendants' property inspections, the true cost of those inspections, as well as the inflated and fraudulent nature of the fees charged in connection with those inspections and/or inspection services were necessarily revealed to each member of the BOA Property Inspection Enterprise. Nevertheless, the members of the BOA Property Inspection Enterprise continued to disseminate misrepresentations regarding the nature of Defendants' property inspections and the Inspection Fee RICO Scheme in the form of bills, monthly statements and other demands for payment.

279.    Defendants' fraudulent concealment was material to Plaintiff and the members of the Classes. Had the members of the BOA Property Inspection Enterprise disclosed the true nature of the fees for default-related services, Plaintiff would have been aware of the mark-up, and would have challenged Defendants' unlawful fee assessments.

280.    The pattern of racketeering activity described above is currently ongoing and open-ended and threatens to continue indefinitely unless this Court enjoins the racketeering activity.

**D.  Plaintiff and the Class Were Damaged by Defendants' RICO Violations**

281.    By reason of, and as a result of the conduct of the BOA Property Inspection Enterprise, and in particular, its pattern of racketeering activity, Plaintiff and the Class have been injured in their business and/or property in multiple ways, including but not limited to paying excessive and inflated fees charged in connection with the property inspections and/or property inspection services described herein, which can make it impossible for homeowners to become current on their loan and drive them further into default.

282.    Defendants' violations of 18 U.S.C. § 1962(c) and (d) have directly and proximately caused injuries and damages to Plaintiff and the Class who are entitled to bring this

action for three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## JURY DEMAND

283.    Plaintiff respectfully requests a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs, on behalf of themselves and the Classes, respectfully requests this Court to award against Defendants in favor of Plaintiff and the Class all of the following:

a.    Certifying Plaintiffs' claims for class treatment under Federal Rules of Civil Procedure 23, appointing Plaintiff as Class Representative, and appointing Plaintiff's attorneys as counsel for the Classes;

b.    For an order awarding compensatory damages on behalf of Plaintiff and the Classes in an amount to be proven at trial;

c.    For judgment for Plaintiff and the Classes on their claims in an amount to be proven at trial, for compensatory damages caused by Defendants' unfair or deceptive practices, for treble damages, and for exemplary damages to each Class member for each violation;

d.    For an order enjoining BOA and Safeguard from continuing their unfair, unlawful, and/or deceptive practices, and any other injunctive relief as may appear necessary and appropriate;

e.    For judgment for Plaintiff and the Classes on their federal and state law claims, in an amount to be proven at trial;

f.   For restitution of all improperly collected charges and interest, and the imposition
     of an equitable constructive trust over all such amounts for the benefit of Plaintiff
     and members of the Classes;

g.   For an accounting of all credits, disbursements and charges and other benefits
     associated with Plaintiff's and Class Members' real estate transactions;

h.   For pre-judgment and post-judgment interest as provided for by law or allowed in
     equity;

i.   For an order awarding Plaintiff and the Classes their attorneys' fees and costs; and

j.   Any other relief for Plaintiff and the Class the Court deems just and proper.

Dated: May 7, 2021.

By: *Scott D. Hirsch*
Scott David Hirsch
**SCOTT HIRSCH LAW GROUP**
Fla. Bar No. 50833
6810 N. State Road 7
Coconut Creek, FL 33073
Tel: (561) 569-7062
Email: scott@scotthirschlawgroup.com

**GUSTAFSON GLUEK PLLC**
Daniel E. Gustafson (#202241) * *Pro Hac Forthcoming*
Daniel C. Hedlund (#258337) *  *Pro Hac Forthcoming*
David A. Goodwin (#386715) * *Pro Hac Forthcoming*
Canadian Pacific Plaza
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Tel: (612) 333-8844
Fax: (612) 339-6622
E-mail: dgustafson@gustafsongluek.com
        dhedlund@gustafsongluek.com
        dgoodwin@gustafsongluek.com

*Attorneys for Plaintiff*